# Wheeling.

## Coatney, Adm'r *v.* Hopkins *et al.*

### Decided December 14, 1878.

1878
Special Term.

1. At common law the husband *jure mariti* is entitled absolutely to all of his wife's personal property, which shall come into his possession, unless his right thereto is restrained by the deed of the wife before the marriage, or by the instrument that confers the property upon her.

2. A deed of marriage settlement may be so framed, as to deprive the husband of all his marital rights; but he will never be deprived of them to a greater extent, than the terms of the deed clearly require.

3. And when his rights are restrained by such deed only during the life of the wife, at her death he is entitled to all the personal estate embraced in the settlement, subject only to the payment of debts for which it was bound, if any such there were, funeral expenses and charges of administration.

4. Courts of equity will not deprive the husband of his rights at law, by virtue of the marriage, unless there appears to be a clear intention manifested in the instrument, relied upon to create the separate estate, to exclude him.

5. To constitute a separate estate in a married woman by an instrument, such as a deed, &c., no technical language is necessary; but it must appear unequivocally on the face of the instrument to the satisfaction of the court, that the intention was to exclude the husband.

6. The intention of the parties to a marriage settlement is to be collected from the *nature* of the agreement, the *language* and context thereof, the usage in similar cases, and the legal rights of the parties, as they existed before, and would have existed after the marriage, if no such settlement had been made.

7. A deed of marriage settlement, contains the following language, after specifying the property, which is personal property: "Upon trust, that the trustee (naming him) will permit the said D. H. A. during the joint lives of himself and the said L., his intended wife, to receive and take the said property, debts, legacies and money (except $500.00, a portion of the amount due said L. from the estate of John Hopkins, deceased, also her female slave and her increase, and said L.'s beds and bedding, for the joint use of the said D, H. A. and L.: *the money and property above excepted to be held in trust for the said L.*" HELD :

1878
Special Term.

Coatney, adm'r,
v.
Hopkins *et al.*

That the deed created a separate estate in said L. as to the excepted property.

8. As to her sole and separate personal property the wife may dispose of the same, as if she were a *feme sole*; and this she may do without the assent of the trustee.

Appeal from a decree of the circuit court of Pendleton county pronounced on the 11th day of December, 1869, in a cause in said court then pending, wherein Edwin J. Coatney, administrator of the estate of Daniel H. Armentrout, deceased, was plaintiff, and Cyrus Hopkins and others were defendants, allowed on the petition of said Coatney.

Hon. J. T. Hoke, late judge of the fourth judicial circuit, pronounced the decree appealed from.

JOHNSON, JUDGE, furnishes the following statement of the case :

On the 16th day of June, 1842, John Hopkins, of Pendleton county, made his last will and testament, in which he made certain provisions for his daughter Lucinda. The clauses of his will in which such provisions are contained are as follows :

"I also direct that my son, Cyrus, do pay to my daughter, Lucinda Hopkins, $2,000.00, to be paid as follows : $500.00 eleven years after my decease, and $500.00 annually thereafter until it is all paid.

"I also direct that my son, Cyrus, do keep and maintain in a decent manner my daughter, Lucinda, during the

term of eleven years after my decease, and that if daughter Lucinda should want small sums of money, say twenty dollars a year, son Cyrus is to pay the same to her, and the amount thus paid, is to be taken out of her first payment, directed to be paid by son Cyrus. If my son, Cyrus, does pay or cause to be paid to the heirs of my deceased son, Thomas Hopkins, the amount hereinbefore directed, and also $2,000.00 to daughter Lucinda Hopkins, or her heirs as before directed, and keep and maintain daughter Lucinda as before directed, then I will and bequeath to my son, Cyrus Hopkins, and his heirs my home plantation with its appurtenances forever. If son Cyrus fails to pay to the heirs of my deceased son, Thomas, and my daughter, Lucinda, or her heirs, the several sums of money hereinbefore directed to be paid, then at the expiration of ten years after my decease, I direct that my said home plantation be sold by my executor, hereinafter named, and out of the proceeds of said sale, the heirs of my deceased son, Thomas Hopkins, to be paid the amount hereinbefore directed, and that $2,000.00 be paid by my executor to daughter Lucinda as hereinbefore directed, * * * *

"If my wife should die before my decease, I direct all the personal property willed to her to be sold by my executor, and the proceeds to be equally divided between all my children, share and share alike, except two female negro slaves, Ruhanna and Abigail, which two negro slaves I give and bequeath to my daughter, Lucinda.

"I also give and bequeath to my daughter, Lucinda, all the household and kitchen furniture she claims at this time, I direct my son Cyrus to keep one horse beast for daughter Lucinda, for ten years after my decease; and I also will daughter Lucinda the big room up stairs during the term of ten years after my decease."

The will of John Hopkins was admitted to probate on the 4th day of October, 1842.

In March, 1856, the said Lucinda, in contemplation of marriage with one Daniel H. Armentrout, made a deed

to A. W. Dyer trustee, the preamble of which sets out the intended marriage and the fact that she has certain property, describing it, and says:

1878
Special Term.

Coatney, adm'r,
v.
Hopkins et al.

"Whereas it has been agreed by and between the said Lucinda Hopkins and Daniel H. Armentrout, that the said property of every description shall be vested in a trustee, to be held by him in trust, in the manner and for the purposes hereinafter mentioned and declared. Now this deed witnesseth, that the said Lucinda for and in consideration of the sum of $—— to her in hand paid, and by and with the privity and consent of the said Daniel H. Armentrout, testified by his being a party to these presents, hath granted, bargained, sold, assigned, transferred, set over, and doth by these presents, grant, bargain, and sell, assign, transfer and set over unto the said A. W. Dyer, his executors, administrators and assigns, all the property, debts, money and legacies of which the said Lucinda is possessed, or to which she is entitled, in possession or action in law or equity. To have and to hold the same and for the trusts and purposes following, that is to say: In trust for the said Lucinda Hopkins and her assigns until the solemnization of the said intended marriage, then upon trust that the said A. W. Dyer his executors, administrators or assigns, shall and will permit the said Daniel H. Armentrout, during the joint lives of himself and the said Lucinda, his intended wife, to recieve and take the said property, debts, legacies and money, (except $500.00, a portion of the amount due said Lucinda from the estate of John Hopkins, deceased, also her female slave and her increase and said Lucinda's beds and bedding) for the joint use of the said Daniel H. and Lucinda. *The money and property above excepted to be held in trust for the said Lucinda,* and after the death of the said Daniel H. Armentrout, if he shall die before said Lucinda, all the property, debts, and legacies, or so much thereof as may remain, to be paid over to the said Lucinda, her heirs or assigns, and it is further understood that the said A. W. Dyer, his executors, administrators

1878
Special Term.

Coatney, adm'r,
v.
Hopkins et al.

and assigns, are held and fully authorized, to collect all the debts, legacies and moneys, belonging or owing to the said Lucinda Hopkins, to be held by him for the purposes herein set forth."

The deed is signed and acknowledged by Lucinda Hopkins, Armentrout and Dyer, the trustee.

At February Rules, 1860, of the circuit court of Pendleton county, the said Daniel H. Armentrout filed his bill in chancery, alleging, the provisions of the will above set forth, also the deed of settlement, his marriage on the 12th day of April, 1857, with said Lucinda Hopkins; that in May, 1844, the widow of John Hopkins died, and that ever since that time Cyrus Hopkins had been in possession of the upper tract or home plantation of John Hopkins, bequeathed to him by the will of his father, subject to the legacies charged thereon; that there was no provision made by the terms of the antenuptial deed for the disposition of the property of Lucinda, in the event the plaintiff survived his late wife, Lucinda, who died on the 11th day of July, 1858, intestate, and without issue; that plaintiff qualified as the administrator of her estate; that as his late wife died intestate and without issue, under the law of the land and the facts of the case he is entitled to recover and hold the whole of his late wife's personal estate *absolutely*: 1st. because he survived her, and 2d. because of his marital rights.

He charges that said Dyer never acted as trustee under said deed. He says, he believes that a small part of the said $2,000.00 legacy in favor of said Lucinda was paid to her by said Cyrus before the marriage, but how much he is not advised; that he came into possession of a bond executed by said Cyrus for $500.00, which bond he believes was executed for a part of said $2,000.00 legacy; that he assigned this bond to a certain Dr. Moore, which if paid, he thinks ought to be applied as a credit on said $2,000.00 legacy. He charges that there were in his possession for a considerable time before the death of his said late wife, Lucinda, other bonds, to-wit: one for

$500.00 executed by said Cyrus, as a part of said legacy, said bond was credited by $380.00, *also other bonds due and owing* to his said wife, which other bonds he is unable to describe because he has not particularly examined them. These bonds together with the said $500.00 bond with the credit of $380.00, he kept locked in a desk of his own, where they had remained for many months previous to the death of the said Lucinda. It happened however, that about the last hours of the said Lucinda's life he discovered that said bonds had been taken away. He believes and charges that the key which locked the desk, in which said bonds were kept, was taken from his pocket while he slept, by means of which key access was had to said bonds. He knows not who took the key from his pocket or who carried off the bonds; that it is a source of great pain to him, to make the charge, which he here directly makes, that the said bonds taken from his desk have fallen into the hands of said Cyrus Hopkins; that at the time the said bonds were so abstracted from his possession, and went into the possession of said Cyrus, plaintiff's said wife, Lucinda, from weakness and debility both physical and mental was utterly unable to make any rational disposition of her effects ; however the idea that she disposed of said bonds by way of a *donatio mortis causa*, is preposterous.

He charges that his said wife before her marriage with him, from the time of the death of her mother to the time of her marriage, performed various work, and gave attention to the domestic business of the said Cyrus in his family, which was of great benefit to said Cyrus ; and that he ought as the legal representative of his wife, Lucinda, to recover from the said Cyrus fair compensation for said services.

He further represents, that the negro slaves, Ruhanna and Abigail, were both dead ; but that the last named worked several years for said Cyrus before the marriage of plaintiff with said Lucinda, for which services plaintiff ought to be paid.

The prayer of the said bill is that said Dyer, trustee, and Cyrus Hopkins be made defendants to the bill, that said Dyer be compelled to answer and say, whether he has proceeded to execute said trust in any particular, and if so, what he has done thereunder ; and that said Cyrus be compelled to say, if the charges of the bill are not true, and if not wherein, and that he be compelled directly to answer how much of the said legacy of $2,000.00 he has in fact paid, when he paid it, and to whom he paid it; and that he be required to produce, and exhibit every paper, which came into his possession, which was once in the possession of plaintiff, or his said wife Lucinda, and that he be compelled to show, how, and when he came in possession of such paper; and that a commissioner settle all accounts between plaintiff, as administrator of said Lucinda, and the said Cyrus Hopkins, and that he may have a decree for such amount as is due him ; and he prays also for general relief.

Dyer the trustee did not answer the bill. The answer of Cyrus Hopkins was filed on the 1st day of May, 1860, to which answer there was a general replication.

The answer of said Cyrus is substantially as follows: That John Hopkins died in September, 1842, leaving the will exhibited with the bill. The wife of said Hopkins died two years after her husband. It sets out substantially the provisions of the will relating to the legacy to Lucinda. That the two negro slave girls are both dead ; that they were each about sixteen years old at the time of their deaths, respectively. That Abigail was quite a child, when John Hopkins died; and respondent had to rear her at considerable trouble and expense. Respondent makes no charge for raising her, and the idea of complainant charging respondent for her services and for the services of his wife, Lucinda, is absurd and ridiculous. As soon as Abigail was large enough to go out to work, Lucinda put her out ; and she never rendered any service to respondent worthy of consideration beyond her board and clothing while there ; and respon-

dent's sister never dreamed of any charge of the sort, as Abigail was most generally hired out, and was only at respondent's house at intervals, when not bound out. Respondent's sister lived in his family, and did such acts of sisterly kindness and attention, as she chose to do without intending any particular service for respondent. She went where and when she chose, precisely as any other boarder would have done; and respondent claims that he has a just claim against her for board. That she was frequently sick and required attention from respondent's family. Respondent furnished her a horse when she wanted to ride. Respondent claims for her board at $175.00 per year from eleven years after testator's death up to the time of her marriage in 1856, which amount should be credited on any indebtedness from respondent to her, if there is any. The marriage is admitted as stated in the bill. The marriage contract is also admitted.

He insists, by said marriage contract it was intended, that she should have her separate property, to dispose of as she pleased, free from the control of her husband. That her property should be secured to her the same as if she were a *feme sole* to dispose of during her life in any way she should see fit; and the reason of this was, that Daniel H. Armentrout was deeply involved, and she was informed, that unless her property was settled on her, it would be taken to pay his debts. The marriage contract was drawn by Edward W. Dyer, who was not a lawyer and not suitable to prepare such contracts, and if in legal construction it fails to carry out that purpose, it is not what it should be, and should be corrected.

At the end of eleven years from testator's death, respondent paid his sister $500.00, as shown by receipts 1, 2, 3, 4, 5. These receipts are exhibited with the answer, and are all signed "Lucinda Hopkins," and each specifies, that it is money paid on the legacy due her. The first is for $20.00, dated September 24, 1845;

the second for $20.00 dated December 12, 1846; the third for the same amount, dated 15th August, 1848; the fourth for a like amount, dated November 22, 1849; and the fifth for $420.00, dated November 10, 1853. For the remaining $1,500.00 respondent executed his three bonds for $500.00 each. The first dated 28th October, 1854, was transferred to Dr. Moore and paid by respondent to him, and is exhibited with the answer. Respondent does not know how complainant became possessed of that bond; he claims it was by unfair means and in violation of the contract. The two next bonds are dated 6th December, 1855, and the 6th October, 1856, and are filed with the answer, as is also a bond for $185.00, executed by James Boggs to Lucinda Hopkins on the 21st of September, 1854. The $185.00 respondent is satisfied is a part of the money by him paid to his sister in 1853, which she loaned to Boggs. On the bond of 6th December, 1855, is a credit of $380.00. This sum respondent paid his sister after her marriage with complainant. He went to the house of his sister and she went and got it out of her trunk or bureau, respondent forgets which, and brought the bond to respondent and received the money herself and put it away. At the request of D. H. Armentrout he placed the credit on the bond, and it was returned to her.

This bond and the other bond for $500.00, dated the 6th October, 1856, and the Boggs bond, as respondent believes, were never in the possession of D. H. Armentrout, unless such possession was obtained by fraud or force, but remained in the possession of his wife, Lucinda, until by her direction they were given to respondent. That gift was in this way: respondent frequently visited his sister, when she was sick; some few days before her death respondent went to see her and found at her house Mrs. Thomas J. North. After being there awhile, Mrs. North told respondent, that his sister, Lucinda, had told her to take her keys, unlock her trunk or bureau (respondent does not recollect which) and take out of it the said last mentioned three bonds, and give them to re-

spondent, as she wished respondent to have them, and no one else. Mrs. North did as directed, and delivered said last mentioned bonds to respondent; and he has had them ever since. Soon after Mrs. North delivered the bonds to respondent, Lucinda Armentrout, who was very deaf, and could not have heard the conversation between Mrs. North and respondent, turned over in bed and asked Mrs. North whether she had given the bonds to respondent, and Mrs. North replied that she had. Lucinda was at the time perfectly in her senses and was evidently gratified at the opportunity of giving up and cancelling these bonds; and the respondent claims, that they were thus cancelled and satisfied. These are all the papers given to respondent, or which he received; and they are just as respondent received them. He denies all fraud and combination, and prays to be dismissed with costs, &c.

The answer is sworn to.

There were a number of depositions taken in the cause. Mrs. North, testified, that on Monday evening before Lucinda died, she requested witness to gather up her spoons and put them in the bureau drawer, she then told witness to get the key out of the trunk and see if it would unlock the desk in the room; tried it and unlocked the desk; she then told witness how to open a secret drawer, and she would find in it a little padlock with a key in it, found the little padlock with the key in it, told her she had it; she then told witness to see if she could unlock a little tin trunk in the desk, which witness did with the little key in the padlock and told her she had done so; she then told witness to get a little bundle, which was in the trunk, and bring it to her, which she did and it turned out to be the right bundle; witness then brought the tin trunk and set it on the bed by Lucinda, and she took out some notes, one on Cyrus Hopkins for $500.00, witness thinks, and one on James Boggs, she handed them to witness and told her to put them in her trunk at the foot of the bed, which she did. She

told witness then to put up all the things as she found them and put her key in her trunk, which witness did. The next day witness went back to see Mrs. Armentrout again ; and after she got there Cyrus Hopkins came, and she told witness, to give Cyrus Hopkins, her brother, all the papers in her trunk, *and to tell him to take everything.* Witness did this, and handed to Cyrus Hopkins, the notes she had put in the trunk together with some other papers that were in the trunk. Mrs. Armentrout thought she could not live, witness thought so to, and so did the doctor, when he saw her shortly after the papers were handed to Cyrus. The papers were delivered to Cyrus on Tuesday ; and his sister died before day on Friday morning. She was rational, witness believed, as much so as at any time during her sickness.

On cross-examination witness said that Lucinda opened the bonds and there was but one on Cyrus Hopkins, witness did not see any of the papers in the trunk and did not know what they were. The desk, in which the tin trunk was, was the desk, in which Armentrout kept his papers. Supposes the key was the one that properly belonged to the trunk at the foot of the bed. At the time the papers were taken from the desk, Mr. Armentrout was not in the house, nor was any other member of the family ; it occurred in the day time, Mrs. Armentrout took considerable property to Mr. Armentrout's house, when she was married.

Mrs. North's statements are uncontradicted.

Christian S. Bowers's deposition was taken on the 26th of September, 1860 ; and he says that "a year ago last February I pressed Mr. Armentrout for money, and he came to my shop to talk about it, and asked for further time, until he could see about this money that he expected to get in his hands from Mr. Hopkins, and told him that it was too uncertain, and that it was putting me off too long, and he made mention that it could not be long, until he would get it in his possession ; as well as I can recollect he said the bonds or the money ; I asked him

why he did not pay me when he had them in his possession? and he said *he never had them in his possession.* This witness also proves that Cyrus Hopkins boarded his sister and treated her well, kept a horse for her &c.; and that she did not render service in his family.

A. W. Dyer testified, that Lucinda was not a domestic in Cyrus Hopkins's family, that she was boarded there and went and came as she-pleased. He says that he thinks the board and washing for Lucinda was worth $150.00 per annum.

One witness says, that towards the close of Lucinda's sickness she did not think she was in her right mind, was with her all night on Monday night before she died, "she seemed to doze, and did not seem to notice much. Requested witness to let Cyrus know, and let him be with her the next night, at that time witness noticed her mind becoming impaired, was satisfied that she was not capable of transacting business on Wednesday afternoon. Lucinda lived with her brother Cyrus from her father's death until her marriage.

The foregoing is the substance of the testimony bearing upon the issues in this case.

The statute of limitations was not pleaded. D. H. Armentrout having died on the 4th day of December, 1866, the cause was revived in the name of E. J. Coatney his administrator.

On the 16th day of September, 1869, the final decree was pronounced, construing the marriage contract and holding, that as to the excepted property it was her sole and separate estate, and she had absolute control over it, and gave what remained of it to-wit: the $500,00, to her brother Cyrus; but that as to the residue, she had no right to give that away, as it was for the joint use of Armentrout and wife during their joint lives, and as he survived her, according to law he was entitled to it as her administrator, without being required to distribute, but subject nevertheless to the debts of said Lucinda, and that it apeared that Lucinda owed to said Cyrus for

board more than what she gave him that she had no right to give, to-wit, the property settled for the joint use of herself and husband, therefore the defendant did not owe plaintiff any thing; and decreed that the bonds be delivered up to Cyrus, and denied the plaintiff any relief, and gave costs against him.

To this decree an appeal was allowed.

C. Boggess, for appellant, relied on the following authorities:

3 H. & M. 399; 1 Lead. Ca. Eq. 539; 5 Munf. 467; 16 Gratt. 275; 24 Gratt. 250; 3 Sumn. (U. S.) 170; 11 Gratt. 438; Bald. 464; 5 Munf. 86; 3 Gratt. 335; 12 Gratt. 432; 1 Lead. Ca. Eq. 540; 8 Pet. 326; 12 How. 98; 17 Gratt. 615; 3 Leigh 377; 1 Gratt. 483; 16 Gratt. 242; 3 Leigh 356; 14 Gratt. 266; 1 Lead. Ca. Eq. 75, 82; 2 Leigh 359; 14 How. 488; 3 Rand. 373; 6 Leigh 320; 13 Gratt. 183; 16 Gratt. 264; 4 Gratt. 472; 1 Lead. Ca. Eq. 862, 863; 3 Binn. 360, 366; 2 Leigh 337; 11 Gratt. 182; 2 Lom. Ex'rs 177; 2 Rop. Leg. 1026; 2 Lead. Ca. Eq. 579, 585; 16 Gratt. 280.

There was no appearance for the appellee.

JOHNSON, JUDGE, delivered the opinion of the Court:

The important question to be decided in this cause is: What effect the deed of marriage settlement had upon the property of Lucinda Hopkins? She was about to be married and was possessed of certain *personal* property, and must have intended that the deed would have some effect upon it *during* the marriage and in a certain event, at least, after the marriage was dissolved by death.

This cause arose before the adoption of the Code of 1868, that provides for the separate estates of married women, and must be decided according to the principles of equity, uninfluenced by statute. The language of the deed is somewhat peculiar. After conveying all her property to the trustee, follows this language: " To have

1878
Special Term.

Coatney, adm'r,
v.
Hopkins et al.

and to hold the same, and for the trusts and purposes following, that is to say : In trust for the said Lucinda Hopkins, and her assigns until the solemnization of the said intended marriage ; then upon trust that the said A. W. Dyer (the trustee) his executors, administrators or assigns shall and will permit the said Daniel H. Armentrout, during the joint lives of himself and the said Lucinda, his intended wife, to receive and take the said property, debts, legacies and money (except $500.00, a portion of the amount due said Lucinda from the estate of John Hopkins, deceased, and also her female slave and her increase, and said Lucinda's beds and bedding) for the joint use of the said Daniel H. and Lucinda. *The money and property above excepted, to be held in trust for the said Lucinda ;* and after the death of the said Daniel H. Armentrout, if he should die before said Lucinda, all the property, debts and legacies, or so much thereof as shall remain, to be paid over to the said Lucinda, her heirs or assigns." It does not make any provision for the property, or that remaining, in case she died before her husband. She did die before her husband.

The first question is : What were his rights as to the unexcepted property at the death of his wife?

The marriage settlement in the case of *Pickett et ux. et al.* v. *Chilton,* 5 Munf. 467, was very much like the one in this cause, much nearer like it than in any other case I have found except one in 16 Gratt. In that case Mrs. Felicia Chilton, the widow of Orrick Chilton, deceased, who was possessed of a considerable personal estate, and had then living two children by her first husband, being about to marry John Chilton, made a deed of trust of her said property to George Christopher, and Thomas Chilton their executors, &c., *upon trust,* "for Felicia Chilton and her assigns, until the solemnization of the marriage, then upon trust, that they, the trustees, their executors, &c., should permit the said John, and Felicia Chilton his intended wife, to have, receive and enjoy all the *interests* and *profits* of the said property assigned, to and for his

own use and benefit, and from and after the decease of such of them, the said John and Felicia, as should first happen to die, then upon trust, that he, the said trustees, &c., should assign, transfer and pay over all the said property that may remain to the said Felicia Chilton in case she survived *John Chilton, but if she died before him,* then unto such person or persons, and at the time, and in the proportions, *as she the said Felicia should, notwithstanding her coverture, by any writing or writings under her hand and seal, attested by three or more credible witnesses,* or by her last will and testament in writing, to be sealed, &c., and published before the like number of witnesses, *direct, limit, or appoint; to the intent that the same might not be at the disposal of or subject to the control, debts, forfeitures or engagements of the said John Chilton.*"

Then followed a provision that in the the event of *her surviving him* and claiming any part of *his* estate by right of dower or otherwise, the trustees should hold *for his benefit,* and *that of* his executors, &c.

No provision was made in the deed for the event, *which afterwards actually occurred, by the appellee's surviving his wife, and her failing to make any appointment.*

The controversy was, whether the husband, or the wife's two children by a former husband were entitled to the property. The case was ably and elaborately argued by distinguished counsel.

Judge Roane delivered the opinion of the court, in which he said: "Upon a true construction of the marriage agreement, among the exhibits, the right of John Chilton, the husband, to the personal estate of Felicia Chilton, his intended wife, embraced by the said agreement is, by the terms thereof, only restrained during the coverture to the use of said property; and that after the coverture in the event, which has happened, of his surviving her, the said Felicia, the same was only intended to be further restrained, if, and in the event that, she she should limit and appoint the same pursuant to the power given by the said deed. *    *    * That these

provisions are to be considered as exceptions to, and re-
strictions upon, the general right which he would other-
wise have acquired as a husband, in and to the prop-
erty aforesaid, and are to be no farther extended than as
aforesaid, under the provisions of said deed; and that
there are no sufficient expressions therein, importing that
his said intended wife should be considered as a *feme sole*
farther than is inferable from the limitations and powers
aforesaid; nor that the husband agreed to *renounce* all
his marital rights to the property in question.   *      *
On these grounds, and it not appearing that the deceased
wife made any appointment pursuant to the powers given
her by the deed, the court is of the opinion, that the right
of the husband is not barred, and that the decree is not
erroneous." The decree was that the complainant should
receive the property included in the deed.

In *Mitchell* v. *Moore et al.*, 16 Gratt. 275, the deed is in
almost the precise language of the deed in the former
case. The wife died first and made no appointment.

Robertson, Judge, in delivering the opinion of the
court, said: "In this case the deed of settlement only ex-
cludes the rights of the husband surviving his wife, in
the event of her exercising the power of appointment
conferred on her. She died without exercising that
power and leaving her husband surviving, so that he be-
came entitled to all the personal estate embraced in the
settlement, subject only to the payment of debts, for
which it was bound, funeral expenses and charges of ad-
ministration."

It seems to be well settled, that at common law the
husband *jure mariti*, is entitled absolutely to all of his Syllabus 1.
wife's personal property, which shall come into his pos-
session, unless his right thereto is restrained by the deed
of the wife made before the marriage, or by the instru-
ment that conferred the property upon her.

A deed of marriage settlement may be so framed as to Syllabus 2
deprive the husband of all his marital rights; but he
will never be deprived of them to a greater extent than

the terms of the deed clearly require. *Mitchell* v. *Moore et al.,* 16 Gratt. 275.

And when his rights are only restrained by such deed during the life of the wife, at her death he is entitled to all the personal estate embraced in the settlement, subject only to the payment of debts for which it was bound, if any such there were, funeral expenses, and charges of administration. *Mitchell* v. *Moore et al.,* 16 Gratt. 274 ; *Pickett et ux.* v. *Chilton,* 5 Munf. 467 ; *Mathews* v. *Woodson,* 2 Rob. 601.

In this case, the deed did not reserve to Lucinda Hopkins the right to dispose of the property, but only provided, that, if she survived her husband, the property should be delivered to her, &c. The principles of the two cases we have cited govern this ; and as to all the property embraced in the deed, or so much as remained thereof, except that which was excepted by the terms of the deed, which we are not now considering, the husband of the said Lucinda was entitled to recover after her death ; and it was his, subject to the payment of any debts for which it was bound, if any there were, funeral expenses and charges of administration.

The next question is : Did the said Lucinda according to the terms of the deed of settlement have a separate estate in the excepted property ?

It is true, that courts of equity will not deprive the husband of his rights at law by virtue of the marriage, unless there appears to be a clear intention manifested in the instrument, relied upon to create the separate estate, to exclude him. *Buck et al.* v. *Wroten et ux.,* 24 Gratt. 250.

To constitute a separate estate in a married woman by an instrument such as a deed &c., no technical language is necessary ; but it must appear unequivocally on the face of the instrument to the satisfaction of the court, that the intention was to exclude the husband. *Heathman* v. *Hall,* 3 Ired. Eq. 414.

The intention of the parties to a marriage settlement is

to be collected from the *nature* of the agreement, the *language* and context thereof, the usage in similar cases, and the legal rights of the parties as they existed before, and would have existed after the marriage, if no such settlement had been made. *Tabb et al.* v. *Archer et al.*, 3 H. & M. 399.

In England it has been held, that "a mere devise to a woman 'for her sole use and benefit,' does not sufficiently indicate an intention to limit the devised property to her separate estate," 1 De G. J. & S. 37. In this case the woman was not married when she took under the will. "Sir Anthony Keck, Mrs. Vernons's father, did by his will, made in 1695, devise the sum of £200 to his daughter, Mrs. Vernons, in these words, viz: 'To be by her laid out in what she shall think fit, in remembrance of me.' He gave also another legacy of £50 to the *deceased* Mr. Vernons, and made him one of his executors. It was said, that taking all these circumstances together, it must be intended, that the testator did plainly design this as a legacy to the separate use of his daughter, though he does not use these very words." And it was so decreed. *Atcherly* v. *Vernon*, 10 Mod. Rep. 532.

In *Tyrrell* v. *Hope*, 2 Atk. 561, the words in the instrument were. "That she shall enjoy and receive the issues and profits of one moiety of the estate, &c." The master of the rolls said : "Now the words separate estate are not in the note; but there are other words which amount to it," he then quotes the words, and says: "which can admit of no other construction, but that it must be for her separate use ; for to what end should she receive it, if it is the property of the husband the next moment. The word *enjoy* too, is very strong to imply a separate use to the wife."

In *Lee* v. *Prieaux*, 3 Bro. C. C. 316 it was held, that a "legacy to a *feme covert*, 'her receipt to be a sufficient discharge to the executors,' is equivalent with saying to her sole and separate use."

In *Wills* v. *Sayers*, 4 Madd. Ch. 216, the bequests were to a married woman, the first, "for the sole and separate use and profit &c." and afterwards, a bequest of the residue "for her own use and benefit." The Vice Chancellor said: "In equity, as at law, a gift to the wife is a gift to the husband, who being bound to maintain the wife, is entitled to her property. A court of equity however will execute a trust for the sole and separate use of the wife, when the intention of the donor to that effect is unequivocally declared. A gift to the wife for her use is no declaration of such an intention; and it is difficult to find any substantial distinction between a gift to a wife for her use, and a gift to a wife for her own use. But if such a distinction could prevail in another case, it could not govern this case. Here the testator, as to the same person with respect to another gift, has appointed a trustee, and expressly directed the application of it to her sole and separate use; he knew therefore the technical form of excluding the right of the husband; and I cannot infer that as to this legacy he intended what he has not expressed."

In Pennsylvania, 6 Serg. & R. 466, it was held, that "a bequest to a married woman, for her own use, is equivalent to a bequest to her, for her separate use."

"By a devise to A., wife of B., during her natural life and at her death to her children in fee, to be for her and her family's use, during her natural life, and the children and their heirs to enjoy it at her death; B. takes no estate. By this devise A. takes an estate for life for her separate use, remainder to her children in fee." *Heck* v. *Clippenger*, 5 Penn. St. 385.

"A bequest to a widow for her own proper use during her lifetime, remainder over, gives her a separate use." *Snyder* v. *Snyder*, 10 Penn. St. 423.

In *Jarvis* v. *Prentice*, 19 Conn. 273, A. by his will divided his estate into six parts, one of which he gave to his wife, the residue to his five children and their heirs forever, to be "for their own sole use and benefit," and

for that purpose to be received and held in trust, by certain trustees. C. one of the five, was a married woman, it was held that the portion given by the will to C., was given in trust for her sole and separate use.

"A gift to a married daughter, for her support during her natural life, creates a separate estate in the daughter." 11 Rich. 393.

A bequest of slaves to a *feme covert* "to her and the heirs of her body *and to them alone*," does not confer a separate estate on the wife in exclusion of the rights of the husband. 4 Rich. 390. In *Heathman* v. *Hall*, 3 Ired. Eq. 414, it was held, that "to constitute a conveyance to a trustee for a married woman, one for her sole and separate use, no technical language is necessary; but it must appear unequivocally, on the face of the instrument to the satisfaction of the court, that the intention was to exclude the husband from any interference with the property conveyed. Where a conveyance was made to a trustee of certain negroes, in trust for the entire use benefit and profit and advantage of the *feme covert*, by these words a sole and separate estate in the property was conveyed to her."

In *Ashcraft* v. *Little*, 4 Ired. 236, it was held, that "where a deed of gift of a negro woman was made to a married woman and her children (two sons) and these words were added, 'but the said gift' to extend to no other person,' that the words did not create a separate estate in the wife, especially as they extended equally to the gift to the sons, and that therefore the husband was entitled to the share of the negro so given to the wife." Daniel J. dissented.

In *Bridges* v. *Wood*, the bequest was of a female slave to a married daughter, in these words, a "female slave and her increase to be at her own disposal in true faith, to her and her heirs forever." It was held, that the will manifested a clear intention to create a separate estate in the married woman.

In *Hamilton* v. *Bishop & Fly*, 8 Yerg. 33, " where

a slave was given to A. (a married woman) and the heirs of her body, 'to the use of the said A. and children and to remain in the possession of said A. for the use and support of said children forever,' it was held that this was a gift for the sole and separate use of the wife and children."

In *Fears* v. *Brooks*, 12 Ga. 195, where A. left the *residuum* of his estate equally among his children, and directed that the shares of his daughter be paid by his executor to a trustee, afterwards named in the will for their use, then appoints a trustee, and directs him, "to receive from, and receipt to my executors, for the distributive share due to each of my daughters, and to be invested by him in such property, as in his judgment, may be most conducive to their comfort and interest, and to have the title to such investment made to him, as trustee, for their use and benefit," it was held, "that a separate estate was created in his daughter, and that the power of alienation was restrained."

In *Scott et ux. and Claiborne* v. *Gibbon et al.*, 5 Munf. 90, Judge Roane in delivering the opinion of the court said, that " upon a true construction of that deed, which declares that William Scott and Mary Davis, two of the parties thereto, should enjoy " *the interest and profits* of the property settled jointly during their lives, that the settlement was made with the consent of William Scott, the intended husband, that the trustees therein named do permit the said William and Mary, during their *joint* lives to take and *enjoy* the said interest and profits, for their *own* use and benefit, the idea of a *property* in the said William in and to the settled subject during the coverture is clearly reprobated. A contrary construction would not only defeat the avowed object of the settlement by sweeping away the property aforesaid, but it is in utter hostility with that part of the deed aforesaid which vests the property in the said William in the event of his surviving his wife; in which case the trustee is directed, to *transfer, assign and pay over* the property,

settled to William, terms which by contract closely import the contrary idea in relation to the same during the coverture."

In *Smith* v. *Smith's adm'rs*, 6 Munf. 581, the deed contained this clause : "Grant and confirm unto the said Elizabeth H. Smith two negroes, Lucy and Mary her child, to have and hold to her own special use and afterwards to her heir or heirs. Nevertheless if the said Elizabeth H. Smith should die without heir, or heirs, or without a will disposing of the said Lucy and Mary, with their increase, to return to me or my heirs, as if this conveyance had never been made." The deed was made by Jane Johnston, the mother of the grantee. The action was detinue, brought against said Elizabeth H. Smith, by the administrator of John Smith, who was the husband of the said Elizabeth. Judge Roane, delivered the following brief opinion of the court : "Upon the evident intention of the donor in the deed in the proceedings mentioned, and on referring to the authorities, the court is of the opinion, that the negroes in question were conveyed to the separate use of the appellant. The judgment is therefore to be reversed, and entered for the appellant."

In *West* v. *West's ex'r*, 3 Rand, 373, it was held, that "where a man made a will, by which he gave one-fifth part of his estate to his executors, for the benefit of a married daughter (who lived separate from her husband) at the discretion of his executors and also desired his executors to bring suit against the husband of said daughter for £200, which, when recovered, he desired his executors to dispose of the same to his said daughter to be disposed of at her discretion, that the devise gave the daughter a separate estate in the property devised."

In *Lewis* v. *Adams*, 6 Leigh 320, the language in the trust was : "In trust for Ish's daughter, Lucinda Adams, and all her children, their heirs, executors, administrators and assigns." The deed conveyed two slaves.

1878
Special Term.

Coatney, adm'r,
v.
Hopkins et al.

Brockenbrough J. said : "It is further objected, that by the deed the slaves are conveyed to the trustee, not for the separate use of the wife, but only in trust for her and her children ; and her interest in the slaves enured to the benefit of the husband. It seems to me, that the object of the deed is manifestly to vest in the trustee the legal estate, exclusively for the benefit of the wife and children, independent of all control of the husband, and that he had no interest legal or equitable in the slaves."

In the same case Judge Carr said, page 335: " It was further objected, that the property in the deed of trust not being conveyed to the separate use of the wife but simply to the use of the wife and children, her interest would enure to the husband, and might be levied on by his creditors. I think not. Whenever a gift is made to the wife during coverture, even by a stranger, if it appear by any circumstance, that the intention of the donor was that she should have it to her separate use, equity will give effect to this intention, and hold the husband her trustee. * * * * In our case the deed is made to the trustee, not for the use of the husband at all, but in trust for the daughter of the grantor, and all her children. Now would not this trust be most clearly violated, and the intention of the grantor wholly perverted, by suffering execution against the husband to be levied on this joint provision for the wife and children?"

In this case the suit was brought on an indemnifying bond, which was given the Sheriff who levied on the slaves mentioned in the deed of trust. It did not appear, that there was any relator in the suit, but the Sheriff brought the suit in his own name. The jury found a special verdict, among other things that the deed of trust, referred to in the opinion above quoted from, was executed ; upon the special verdict the court decided in favor of the defendants, and the trouble in the Court of Appeals seemed to be the absence of a relator. Tucker P. said: "Believing as I do, that this transaction, as disclosed by the special verdict, was neither fraudulent in

fact, nor in law, and that the case of *Lydnor* v. *Gee*, places that matter beyond a doubt, it is with very great regret and reluctance I feel myself compelled to affirm the judgment upon what may seem to be mere matter of form, though upon all correct principles it is irresistibly a matter of substance. I refer to the omission to set forth a relator, either in the suit or declaration."

1878
Special Term.

Coatney, adm'r,
v.
Hopkins *et al.*

Judge Brooke said : "As he concurred with the majority on the merits, he thought it would be best to reverse the judgment and remand the case for further proceedings," which was accordingly done. None of the judges dissented from the views of Brockenbrough and Carr J. J. as above quoted.

In *Cleland* v. *Watson*, 10 Gratt. 159, a father by deed, " granted to Dorothy Cleland (his daughter) for the use of herself and her husband, John Cleland, and their joint heirs forever, a number of slaves and other personal property, to have and to hold the said slaves and other property unto his daughter Dorothy Cleland aforesaid and her husband John Cleland, their heirs, executors, administrators and assigns." The court held, that "according to the legal construction of the deed, * * * a "joint estate was conveyed to John Cleland and Dorothy his wife." That there was nothing on the face of the deed, to show that the husband was not the object of the grantor's bounty, as well as the wife. The property was granted to his use as well as to hers ; and by the *habendum*, the said Dorothy and her husband were to hold the property to them, their heirs, &c. The court further held that the joint estate so conveyed to the wife and her husband, carried with it the right in the husband, to dispose of the property absolutely, after it had been reduced into possession.

In *Nixon* v. *Rose*, 12 Gratt. 425, the testatrix bequeathed to three persons a number of slaves, upon the following trust, "to be held by them in trust only for the use and benefit of my daughter Emily Coupland, or her heirs. And as it is my wish to guard

1878
Special Term. in the most ample manner against the imprudent sale,
Coatney, adm'r, or other disposition of the aforesaid property, dur-
v.
Hopkins et al. ing the natural life of the said Emily Coupland, it is
hereby wholly and solely confided to the discretion of
the aforesaid trustees (naming them) in what manner the
said Emily Coupland shall receive and enjoy the profits
arising from the hire or other disposition of the slaves
aforesaid. And in the event of the death of the said
Emily Coupland without an heir, or heirs, of her body,
then and in that case I desire that all the slaves and their
increase may be given up to my son, Gustavus A. Ross,
or his heirs forever." The court held that Emily took
an absolute interest in the slaves, and the bequest was
not void for remoteness. And further that it was a bequest
to the separate use of the said Emily. In delivering
the opinion of the court, Moncure J. said that "no par-
ticular form of words were necessary" to create a separ-
ate estate in a married woman. That "whenever it ap-
pears, either from the nature of the transaction, or from
the whole context of the instrument, that the wife was
intended to have the property to her sole use, that inten-
tion will prevail. * * Though it seems that the in-
tention to give her such an interest in opposition to the
legal rights of her husband must be clear and unequivo-
cal."

In *Buck et al.* v. *Wroten et ux.*, 24 Gratt. 250, the
language of the will was, "All the rest and residue of
my estate, of whatsoever nature, kind or description, not
hereinbefore disposed of, including all my slaves, and
the future increase of the females thereof, on the death
or marriage of my wife, I give and devise to my daugh-
ter Eliza Ann Genther, and her children, including her
child by her first husband, Wm. Rollow, deceased, to
and for her and their sole and separate use and benefit,
and not to be subject to, or liable in any way whatsoever
for the debts of her husband Henry D. Genther." The
facts showed that at the testator's death his daughter, Eliza,
had five children, three daughters and two sons, one o-

the daughters being about twenty years old and the 1878 Special Term.
Coatney, adm'r,
v.
Hopkins et al. other two, being ten, and three, respectively. The first married Geo. W. Wroten. The suit was brought to subject the property, devised to Sarah the wife of said Wroten, under the sixth clause of the will above quoted, to the debts of her husband, Geo. W. Wroten. The court held, that property left to the granddaughter under the will, was not left to her exclusive use and benefit, so as to defeat the marital rights of her husband.

Christian J. said: "It is clear, that under this clause there is a plain and distinct intention to exclude the marital rights of the husband of his daughter Eliza Ann Genther. But is there no doubt of his intention to exclude the future husbands of his granddaughters, none of whom were married, and two of whom were infants of very tender years? The true construction is in my opinion, quite the other way. The testator is providing for his daughter, and his grandchildren, some of whom are males, and some females. He devises his property to his family, *males and females* "to their sole and separate use, and not to be subject to, or liable in anyway whatever *for the debts of Henry D. Genther*, the husband of his daughter, and the head of that family. It was against *his* (Genther's) debts and liabilities that he was seeking to protect the property, and secure it for the use of his daughter, and grandchildren. There is no allusion made to the marriage of his granddaughters, nor is there anything to show, that the testator had present to his mind the right, which their future husbands would obtain in the property."

Here was a case in which the words used in the devise giving the property to the children, were "for her, and their sole and separate use and benefit," yet it was held, and we think properly held, that those words, under the circumstances, did not give a separate estate in the grand-daughters, hence from the *nature* of the transaction, and the *context*, it was apparent, that it was not the intention of the testator to defeat the marital rights of the future

husbands of his granddaughters. The words in themselves are the appropriate ones to confer a separate estate upon the daughters. It is settled that if a testator gives property to a devisee, or legatee, to use or dispose of at his pleasure, that is, to consume or spend, sell or give away at his pleasure, such devisee, or legatee, has the fee simple or absolute possession, even though his interest in it be called a life-estate by the will, and there be a provision in the will whereby *what* remains of the property, at the death of the devisee, or legatee, is given to another person. *Milhollen's ex'r* v. *Rice,* 13 W. Wa. 510, and numerous cases there cited. In this case, if the wife survived the husband, "what remained" was to be delivered to her. We think therefore there is much force in the language of Mr. Perry in his work on "Trusts" 594, that, "The authorities in the several States, and even in the same State, are conflicting with each other, as to what words are sufficient, and what are not sufficient to create a separate use in a married woman. It is wholly a matter of intention to be gathered from the whole instrument, therefore the context may compel the court to give a different meaning to the same words, or rather the court may be compelled to draw different conclusions of facts from the same words, in different wills, the burden always being upon those, who attempt to exclude the husband, to show that such is the necessary intention of the instrument."

Does the deed in the case before us then give to Lucinda Hopkins a separate estate in the excepted property ?

Syllabus 7. The language is that the trustee "Shall and will permit, the said Daniel H. Armentrout, during the joint lives of himself and the said Lucinda, his intended wife, to receive and take the said property, debts, legacies and money (except five hundred dollars, a portion of the amount due said Lucinda from the estate of John Hopkins, deceased, also her female slave and her increase, and said Lucinda's beds and bedding) for the joint use of the said Daniel H. and Lucinda. *The money and property above excepted to be held in trust for the said Lucinda.*"

The words standing alone, we do not think, would create a separate estate in Lucinda; but when we remember, that it was a deed of marriage settlement, that she gave up all the property to be taken by her husband, except five hundred dollars, her slave and her increase, and her beds and bedding, we must come to the conclusion that it was her intention that such property was to be set apart for her sole and separate use, otherwise the excepted property would be disposed of precisely as the other and the exception would have no effect. The whole frame of the deed, the *nature* of the transaction and at least a part of the property received shows clearly to my mind, that such was the intention. The *contract* shows this, "You to have, all the property, except what, I reserve, that to be held in trust for me." It cannot be supposed that she was willing, only to restrain his rights to all but the excepted property, and to have that so it should be his absolutely; if so, why did she put her "beds and bedding" in that class? I think there is no doubt but the intention of the deed was to give her a sole and separate estate in the excepted property. Having then a sole and separate estate in the said excepted property, as to such property she had all the rights incident to the ownership thereof, and could dispose of it as she pleased, the same as if she had been a *feme sole*, and this she might do without the assent of the trustee. *Fettiplace* v. *Gorges*, 3 Bro. C. C. 10; *Leaycraft* v. *Hedden*, 3 C. E. Green (18 N. J.) 552; *Imlay* v. *Huntington*, 20 Conn. 175; *Vizonneau* v. *Pegram*, 2 Leigh 183; *Newlin* v. *Freeman*, 4 Ired. Eq. 312.

Syllabus 8.

Did *Lucinda Armentrout* dispose of the property? The evidence clearly shows that she did make a gift of it to her brother. It makes no difference what kind of a gift it was, whether a *donatio mortis causa*, or a gift *into vivos*, it was a complete gift by a party, who had the right to make it, and gave a good title to the donee.

But it is said she gave more than she had any right to give, being in excess of the $500.00 mentioned in the

"excepted" property. The evidence shows she did ; but the answer of the defendant claims such excess for board for the said Lucinda, and I think the evidence fully sustains the answer in this respect, and shows as the court below found, that the board amounted to more than the said excess. It is insisted by counsel for the appellant, that when Lucinda gave the $500.00 bond to her brother, it was in satisfaction of her board, upon the maxim that "a debtor is not presumed to make a gift" and that "a debtor should be just before he is bountiful." A sufficient answer is that it was the debt of the husband, which he, and not his wife, was bound to discharge.

I see no error in the decree of the circuit court, and am for affirming the same with costs, and $30.00 damages.

THE OTHER JUDGES CONCURRED.

DECREE AFFIRMED.