385 S.E.2d 384

**Clark W. PAJAK and William J. Pajak**

v.

**Audrey D. PAJAK and Anthony Wayne Poore and Christina Ann Poore.**

No. 18247.

Supreme Court of Appeals of West Virginia.

March 9, 1989.

Dissenting Opinion Filed April 6, 1989.

Jolyon W. McCamin, McCamic & McCamic, Wheeling, for Clark & Wm Pajak.

Ray A. Byrd, Donald J. Tennant, Jr., Shrader, Stamp, Byrd, Brum & Companion, Wheeling, for Audrey Pajak.

H. Brann altemeyer, Phillips, Gardill, Kaiser, Boos & Harley, Wheeling, for Poore.

NEELY, Justice:

William J. Pajak, Sr., married Patricia Schmidt in 1949, and the couple had two children, Christina and Anthony. The couple were divorced in 1954; the former Mrs. Pajak then married George Poore, who raised Christina and Anthony as if they were his own children. Although George Poore never legally adopted Christina and Anthony, when they came of age they formally changed their names to Poore.

William J. Pajak, Sr., married again in 1963 and sired two more children, Clark and William, by his second wife. Mr. Pajak's second marriage also ended in divorce in 1980. In 1979, before his divorce from his second wife, William J. Pajak, Sr., wrote his last will and testament; under this will he devised and bequeathed all of his property to the appellants, Clark Pajak and William Pajak.

Then William J. Pajak, Sr., married his third wife, Audrey, in 1982, one day after he and Audrey entered into a pre-nuptial agreement by which Audrey waived any and all interests in his estate. William J. Pajak, Sr., died in December, 1985 and the 1979 will was offered for probate.

This case arose when Clark and William, Mr. Pajak's children by his second marriage, brought a declaratory judgment action to declare the respective rights in the estate of Clark and William on one side and Audrey on the other. Anthony Poore and Christina Poore, Mr. Pajak's two children by his first marriage, intervened in the action. Ultimately, the two questions before the circuit court were: (1) whether the 1979 last will and testament of William J. Pajak, Sr., was revoked by virtue of *W. Va. Code*, 41-1-6 [1975] because of his remarriage; and, (2) whether the pre-nuptial agreement between Audrey D. Pajak and William J. Pajak, Sr., is valid and binds Mrs. Pajak with regard to her claim for a wife's statutory share of Mr. Pajak's estate.

The circuit court held that *Code,* 41-1-6 [1975] revoked the 1979 will of William J. Pajak, Sr. and, therefore, William J. Pajak Sr. died intestate.[1] The circuit court also held that the pre-nuptial agreement entered into between Audrey D. Pajak and William J. Pajak, Sr., was valid and binding, and that the agreement barred any claim that Audrey Pajak would otherwise have had on the estate. From this decision Mrs. Pajak appealed to have the agreement set aside, and Clark Pajak and William J. Pajak, Jr., appealed to have the invalidation of the will which allowed Anthony and Christina Poore to inherit set aside. Before argument here the issues between William, Clark, Anthony and Christina were settled; that leaves us, then, only Mrs. Pajak's appeal seeking to avoid the consequences of her pre-nuptial contract.

## I.

The pre-nuptial agreement entered into between Mr. and Mrs. Pajak, in its entirety, provides as follows:

1. *W.Va.Code,* 41-1-6 [1975] provides as follows:
   Every will made by a man or woman shall be revoked by his or her marriage, annulment or divorce, except a will which makes provision therein for such contingency, or a will which, though not making provision for such contingency, is made in exercise of a power of appointment, when the estate thereby appointed would not, in default of such appointment, pass to his or her heirs, personal representative, or next of kin: Provided, that even when the estate thereby appointed would, in default of such appointment, pass to his or her heirs, personal representative, or next of kin, such will shall, nevertheless, not be revoked (a) by such marriage if such marriage is between the person appointed in the exercise of such power of appointment and the person exercising such power of appointment, or (b) by such annulment or divorce, unless the person appointed in the exercise of such power of appointment is the person whose marriage to the person exercising such power of appointment was terminated by such annulment or divorce.

THIS AGREEMENT between WILLIAM J. PAJAK, party of the first part, and AUDREY DARLENE HENNEN, party of the second part, this 20th day of August, 1982.

WITNESSETH:

WHEREAS, said parties contemplate entering into the marriage relation with each other; and

WHEREAS, it is the intention of both parties hereto that their marriage shall not in any way change the legal right of children or grandchildren in either of the parties' property from what they are before the marriage; and

WHEREAS, both parties recognize, accept and understand that the party of the first part brings love, affection and worldly goods, and the second party brings love and affection, to the marriage and to each other;

IT IS, THEREFORE, NOW AGREED that for and in consideration of the marriage about to be consummated between the parties hereto, both parties hereto mutually agree:

(1) That the party of the first part will provide and maintain a home for the party of the second part at 21 Arlington Drive, Howard Place, Wheeling, West Virginia, and/or elsewhere, as the parties may agree;

(2) That the party of the first part, in the event he survives the party of the second part, will make no claim to any part of said second party's estate, as her surviving husband, other than that which may be bequeathed him in said second party's will; that the party of the first part waives and relinquishes all his right of statutory dower, or any other, in and to any real estate of which the party of the second part may die seised, and any and all right to her solely owned personal estate, as her surviving husband;

(3) That the party of the second part similarly agrees, in the event she survives the party of the first part, she will make no claim to any part or share of the real or personal estate of which the party of the first part, dies seised, other than that as may be bequeathed her in said first party's Will; that said party of the second part expressly waives and relinquishes all claims to dower, homestead, statutory or other right available to a widow, in and to the real and personal estate of which the party of the first part may die seised and possessed.

(4) IT IS MUTUALLY DECLARED by said parties to be, and it is their intention, that neither party, solely by virtue of said marriage, shall have or acquire any right, title or claim, statutory or other, in and to the real or personal estate of the other, with the same effect as though no marriage had taken place between the parties to this agreement; and that the estate of each shall descend to and vest in his or her respective heirs-at-law, legatees, or other devisees, excepting as may otherwise be provided by and in his or her last Will and Testament.

(5) IT IS FURTHER MUTUALLY AGREED that, in case either of the parties desire to mortgage, or sell and convey his or her separate real or personal estate, if any, each will join in the deed of conveyance, deed of trust and note, or other, as may be necessary to make the same effectual. In the event a purely business transaction involving corporate or individually-owned business, real or personal property, requires the signature of both to consummate, then each agrees to affix his or her signature thereto, without more.

(6) IT IS FURTHER AGREED that this agreement is entered into by each party with the full knowledge on the part of each as to the extent and probable value of the estate of the other and of all the rights conferred by law upon each in the estate of the other by virtue of said proposed marriage. It is their desire, intent, and they hereby agree, in consideration of their marriage, that their respective rights in and to each other's estate as determined by law shall, in lieu thereof, be determined and fixed by this agreement, and shall be, and is, binding upon them and their respective legal heirs, successors and assigns.

(7) In view of the premises, it is further agreed by and between both parties hereto as follows:

(A) The parties hereto are fully cognizant of the business interests of the party of the first part; that each of said parties will join the other, without more, in each and every contract of any kind or nature which may require both signatures to consummate; the party of the second part recognizes that the first party is about to open another branch of Carolina Furniture and that whatever financial arrangements need be made, that the party of the second part will join promptly in them as and when required.

(B) The parties hereto will reside in 21 Arlington Drive, Howard Place, Wheeling, West Virginia, or elsewhere, as they may determine from time to time. The property and its contents now stand in the name of the party of the first part. It is understood and agreed by and between the parties hereto that this real estate, and its contents, unless earlier sold or otherwise transferred, will be disposed of as provided in the Will of the party of the first part in existence at the time of his death.

(C) Both parties have heretofore executed their separate personal respective Wills. The parties hereto agree that:

(1) Either party reserves the right to alter the terms of his or her present Will at any time, and from time to time.

(2) That neither will contest the Will of the other nor make any claim to his or her estate whatsoever, except as provided in said Wills and in accordance with this Agreement.

(D) Both said parties hereto, in consideration of the premises, agree to disclaim and release, and do hereby disclaim and release to the other, on his or her behalf, his and/or her, heirs, legal representatives, assigns, legatees and devisees, all and singular, every statutory or other right, claim and estate, actual, inchoate or contingent, of every kind and character, which either might hold, would or could have held, or acquire in, to or upon all or any of said property of the other, solely by virtue of said marriage, and of being, or having been, the husband or wife of the other; excepting that either of the parties hereto, as hereinabove provided, may, by valid Will, hereafter determine to and does clearly bequeath his or her property and interests to his wife or her husband, parties hereto.

IN WITNESS WHEREOF, the parties hereto have affixed their signatures on the day and year first hereinabove set forth at Wheeling, West Virginia.

The evidence indicates that before his marriage to Audrey, William J. Pajak, Sr., was a man of considerable wealth who had a variety of active business interests. Audrey Pajak, before her marriage, worked as an employee of Carolina Furniture Company, a retail furniture business of which Mr. Pajak was the sole owner. The pre-nuptial agreement at issue in this case was drafted by William J. Pajak Sr.'s lawyer and was presented to Mrs. Pajak at the lawyer's office one day before the couple were married. Mrs. Pajak testified that the lawyer discussed the agreement with her briefly, and that then she signed it without reading the agreement. Mrs. Pajak testified that she did not know that she could have had the agreement reviewed by another lawyer, and that at the time she signed the agreement, she believed that she "wasn't allowed to object" to the wording of the agreement.

Mrs. Pajak argued in the circuit court and now argues on appeal that at the time she signed the pre-nuptial agreement she was not fully informed of the extent of William J. Pajak, Sr.'s, wealth. She also maintains that she did not understand or know the meaning of the words and clauses used in the pre-nuptial agreement. We conclude, however, that the pre-nuptial agreement was entered into willingly and intelligently, and that Audrey Pajak is bound by its terms. Accordingly, we affirm the circuit court.

## II.

Initially, we would point out that the case before us involves a traditional pre-nuptial agreement designed to protect the

inheritance rights of children from claims made by a new wife who is not the children's mother. As we recently pointed out in footnote 2 of *Gant v. Gant,* 174 W.Va. 740, 329 S.E.2d 106 (1985):

> We have always strongly favored pre-nuptial agreements that establish property rights at *death* in West Virginia. *Pickett et ux v. Chilton,* 5 Munf. 467 (1817); *Charles v. Charles,* 8 Grat. 486, 56 Am.Dec. 155 (1852); *Mitchell v. Moore & als.* 16 Grat. 275 (1861); Syl. pt. 1, *Coatney v. Hopkins,* 14 W.Va. 338 (1878); Syl. pt. 2, *Beard v. Beard,* 22 W.Va. 130 (1883); Syl. pt. 1, *Hinkle v. Hinkle,* 34 W.Va. 142, 11 S.E. 993 (1890); Syl. pt. 2 *Bramer v. Bramer,* 84 W.Va. 168, 99 S.E. 329 (1919); *Williamson v. First National Bank of Williamson,* 111 W.Va. 720, 164 S.E. 777 (1931); *Gieseler v. Remke,* 117 W.Va. 430, 185 S.E. 847 (1936).

The reason that pre-nuptial agreements of the type Mrs. Pajak signed are favored by public policy is that they enhance, rather than detract from, opportunities to form marriage relationships in middle-age and later. Typically, a couple marries in their early twenties, has children, and through joint efforts accumulates family assets. If, then, one spouse dies, the surviving spouse may feel a duty to the deceased spouse as well as to the children to protect the assets from claims of a second spouse. Thus, without the ability to enter into enforceable, pre-nuptial agreements that protect assets from the statutory entitlement of a second spouse, an older person with money acquired with the help of his or her spouse in an earlier marriage would be reluctant to remarry. Although in the case before us Mr. Pajak was divorced, it was obvious that he wished to protect the interests of his children.

Indeed, it is unfortunate for Mrs. Pajak that William J. Pajak, Sr., died so soon after the couple were married. Nonetheless, the evidence is that during the marriage Mrs. Pajak lived in a good house, provided by Mr. Pajak; Mrs. Pajak's son by a former marriage was welcomed to live in the house with the couple; Mrs. Pajak was given a new Lincoln automobile; and, Mrs. Pajak generally was accorded all of the rights and privileges of a well regarded wife. It is unlikely that Mr. Pajak would have married Mrs. Pajak had he not been assured that he could protect his assets for his children.

■ Mrs. Pajak maintains that she was unaware of the extent of Mr. Pajak's assets. However, Mr. Pajak was a successful businessman and Mrs. Pajak was aware that he owned a number of businesses, had real estate holdings, and lived reasonably well. Contrary to Mrs. Pajak's reading of the law, for a pre-nuptial agreement to be valid, it is not necessary that both parties execute a detailed, written financial statement such as is required by a bank before making a loan. Although Mr. Pajak made no great moment of regaling Mrs. Pajak with the details of his holdings, there is no evidence that he was at all secretive or in any way misled Mrs. Pajak. Therefore, we find no conduct that would amount to "fraud" such that the agreement should be set aside.

### III.

■ Finally, Mrs. Pajak maintains that she could not understand the agreement and was not accorded an opportunity to have it examined by independent counsel. We addressed this exact problem in syllabus point 2 of *Gant v. Gant, supra,* where we said:

> The validity of a pre-nuptial agreement is dependent upon its valid procurement, which requires its having been executed voluntarily, with knowledge of its content and legal effect, under circumstances free of fraud, duress, or misrepresentation; however, although advice of independent counsel at the time parties enter into a pre-nuptial agreement helps demonstrate that there has been no fraud, duress or misrepresentation, and that the agreement was entered into knowledgeably and voluntarily, such independent advice of counsel is not a prerequisite to enforceability when the terms of the agreement are understandable to a reasonably intelligent adult and

both parties have had the *opportunity* to consult with independent counsel.

It appears from Mrs. Pajak's own testimony that she made no effort even to read the agreement in order to understand as much of it as she could, nor did she ask to have the agreement examined by her own lawyer. We believe that the terms of this agreement comport with the requirement of syllabus point 2 of *Gant v. Gant, supra,* in that "the terms of the agreement are understandable to a reasonably intelligent adult...."

In *Gieseler v. Remke,* 117 W.Va. 430, 185 S.E. 847 (1936) we held:

> In antenuptial agreements a confidential relationship exists between the contracting parties and it is the duty of the prospective husband to fully disclose the amount of his property and to deal fairly with his prospective bride and to honestly carry out the provisions of the contract. [Citations omitted]

117 W.Va. at 432, 185 S.E. 847. However, it must be pointed out that the husband's conduct in *Gieseler* was truly egregious. In that case, the husband deserted his wife without cause seven months after the marriage and refused to return to her or contribute in any way to her support and maintenance from the time of his desertion until the date of his death nine years later. In addition, Mr. Gieseler never delivered to his wife shares of stock that he was to give her under the terms of their antenuptial agreement, and he actively concealed the true nature and extent of his property from his wife.

In the case now before us, Mrs. Pajak testified with regard to Mr. Pajak's assets:

> I assumed he owned the house on Arlington Drive and he owned the Lincoln automobile because he let me drive it. I thought he owned Carolina Furniture Company because he put me on the pay-roll there before we were married. I had no idea what these things were worth.

Certainly, Audrey has not sustained her burden of proof and demonstrated that by a fraudulent concealment of assets she was induced to enter into the pre-nuptial agreement.

■ A person seeking to overcome the presumptive validity of a pre-nuptial agreement designed to protect assets for the children of a previous marriage has a heavy burden of proof.

As we said in *Gant v. Gant, supra:*

> In crafting rules in an area such as the enforcement of prenuptial agreements only one thing is certain: no matter what rules we adopt, there will be cases when the application of those rules will be inequitable. Therefore, the question to be asked is whether the adoption of firm rules making prenuptial agreements presumptively enforceable in their stated, explicit terms will advance or undermine legitimate public policy that favors marriage. In the field of prenuptial agreements, firm rules favoring enforceability inevitably further the public policy of encouraging middle-aged, cohabiting couples to regularize their relationships by getting married.

174 W.Va. at 749, 329 S.E.2d at 115.

Accordingly, the judgment of the Circuit Court of Ohio County is affirmed.

Affirmed.

MILLER, J., dissents and reserves the right to file a dissenting opinion.

MILLER, Justice, dissenting:

I trust that today's opinion does not signal a retreat from this Court's position, evolved over the last decade or so, requiring fair and just treatment for married women.[1] It will be cold comfort to Mrs.

---

1. *See, e.g., Kathy L.B. v. Patrick J.B.,* 179 W.Va. 655, 371 S.E.2d 583 (1988) (mother's right to birth expenses and child support from natural father); *In Re Estate of Weller,* 179 W.Va. 804, 374 S.E.2d 712 (1988) (alimony in gross collectible against deceased husband's estate); *Butcher v. Butcher,* 178 W.Va. 33, 357 S.E.2d 226 (1987) (wife's right to equitable distribution of hus-

band's military pension); *Molnar v. Molnar,* 173 W.Va. 200, 314 S.E.2d 73 (1984) (wife's right to rehabilitative alimony); *Prather v. Prather,* 172 W.Va. 348, 305 S.E.2d 304 (1983) (power of court to impress a trust to secure payment of wife's alimony and child support); *LaRue v. LaRue,* 172 W.Va. 158, 304 S.E.2d 312 (1983) (wife's right to equitable distribution for home-

Pajak to hear the majority intone "[i]ndeed, it is unfortunate for Mrs. Pajak that William J. Pajak, Sr., died so soon after the couple were married." 182 W.Va. at 32, 385 S.E.2d at 388. What is truly unfortunate is the majority's twisting of the law to deprive Mrs. Pajak of her statutory share in her husband's estate.

Initially, it should be pointed out that this case was decided by way of a summary judgment. The majority completely ignores this fact and our well-established law that forecloses summary judgment except "when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, in part, *Aetna Cas. & Surety Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).[2] Greater reluctance to grant summary judgment exists where, as here, the complaint raises an issue relating to subjective intent, such as fraud or breach of a fiduciary relationship. *See Alpine Property Owners Ass'n, Inc. v. Mountaintop Devel. Co.*, 179 W.Va. 12, 365 S.E.2d 57 (1987); *Masinter v. WEBCO Co.*, 164 W.Va. 241, 262 S.E.2d 433 (1980).

By avoiding any discussion of the summary judgment issue, the majority is able to supply critical facts that simply do not exist in the record.[3] At the very least, this case should have been reversed and remanded for trial under Syllabus Point 1 of *Masinter v. WEBCO Co., supra:* "Even if

the trial judge is of the opinion to direct a verdict, he should nevertheless ordinarily hear evidence and, upon a trial, direct a verdict rather than try the case in advance on a motion for summary judgment."

I must also take issue with the majority's reliance on the statement in footnote 2 of *Gant v. Gant*, 174 W.Va. 740, 329 S.E.2d 106 (1985), that "[w]e have always strongly favored prenuptial agreements that establish property rights at *death* in West Virginia." 174 W.Va. at 745, 329 S.E.2d at 112. (Emphasis in original.) Looking at the cases cited in *Gant*, I find no support for this statement. Certainly, *Gieseler v. Remke*, 117 W.Va. 430, 185 S.E. 847 (1936), does not, as the Court there refused to uphold the antenuptial agreement. In *Williamson v. First Nat'l Bank of Williamson*, 111 W.Va. 720, 164 S.E. 777 (1931), the Court, by a 3–2 vote, upheld the antenuptial agreement on the most narrow ground, i.e., that at the time the agreement was discussed, the parties were not engaged, and, therefore, no confidential relationship existed.

*Bramer v. Bramer*, 84 W.Va. 168, 99 S.E. 329 (1919), involved a contract where the husband promised not to assert any claim against his wife's separate property. This Court held that the agreement was not specific enough to cut off his right of curtesy. In Syllabus Point 3 of *Bramer*, we evolved a rule rejecting any broad inter-

maker services); *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981) (primary caretaker rule); *Marshall v. Marshall*, 166 W.Va. 304, 273 S.E.2d 360 (1980) (confidential relationship between husband and wife through marriage requires dealing in good faith); *Sparks v. Sparks*, 165 W.Va. 484, 269 S.E.2d 847 (1980) (wife having custody of children entitled to move with them out of state); *Murredu v. Murredu*, 160 W.Va. 610, 236 S.E.2d 452 (1977) (wife with custody of minor children entitled to exclusive use of family home).

**2.** *See, e.g., Romano v. New England Mut. Life Ins. Co.*, 178 W.Va. 523, 362 S.E.2d 334 (1987); *Lusk v. Doe*, 175 W.Va. 775, 338 S.E.2d 375 (1985); *Price v. Bennett*, 171 W.Va. 12, 297 S.E.2d 211 (1982).

**3.** The following statements by the majority do not appear in the record:

(1) "[I]t was obvious that [Mr. Pajak] wished to protect the interests of his children." 182 W.Va. at 32, 385 S.E.2d at 388. To the contrary, Mr. Pajak's marriage to Mrs. Pajak resulted in the revocation of his will under W.Va.Code, 41-1-6. This will left his property to the two children from his second marriage and ignored the two children from his first marriage. Mrs. Pajak was his third wife.

(2) "It is unlikely that Mr. Pajak would have married Mrs. Pajak had he not been assured that he could protect his assets for his children." 182 W.Va. at 32, 385 S.E.2d at 388. Not only was there no testimony as to this fact, but, as earlier noted, his will left nothing to the two children from his first marriage.

(3) "Mrs. Pajak was aware that he owned a number of businesses, had real estate holdings, and lived reasonably well." 182 W.Va. at 32, 385 S.E.2d at 388. The majority contradicts itself when it quotes Mrs. Pajak's statement that she knew only that Mr. Pajak owned the family

pretation of an antenuptial agreement.[4] The reverse side of *Bramer* is found in *Hinkle v. Hinkle*, 34 W.Va. 142, 11 S.E. 993 (1890), where the widow's right to dower was found not to have been abolished by an antenuptial agreement.

Moreover, in *Beard v. Beard*, 22 W.Va. 130 (1883), the Court concluded that despite an antenuptial agreement making the wife's property separate from any claim of the husband, he was entitled to receive her personal estate when she died. *Coatney v. Hopkins*, 14 W.Va. 338 (1878), was based on the same law governing *Beard*, but the Court in that case found the language of the agreement sufficiently explicit to bar the husband's right to inherit his wife's separate property.

Our earlier cases, such as *Bramer, Hinkle, Beard,* and *Coatney,* do not make any analysis of whether the prenuptial agreement was oppressive or procured by fraud or misrepresentation. They do not consider the various factors contained in *Gant.* The majority purports to rely on Syllabus Point 2 of *Gant*, which predicates the validity of a pre-nuptial agreement on a showing that (1) the agreement was executed "voluntarily, with knowledge of its contents and legal effect"; (2) the agreement was "free of fraud, duress, or misrepresentation"; and (3) independent advice of counsel "helps demonstrate that there has been no fraud, duress or misrepresentation." The majority, however, fails to apply this test to the facts of this case.

We have consistently held, as even the majority recognizes, *see* 182 W.Va. at 33,

385 S.E.2d at 389, that the parties to an antenuptial agreement have a confidential relationship with each other. As we stated in *Gieseler*, 117 W.Va. at 432, 185 S.E. at 848:

"In antenuptial agreements a confidential relationship exists between the contracting parties and it is the duty of the prospective husband to fully disclose the amount of his property and to deal fairly with his prospective bride and to honestly carry out the provisions of the contract."

It is important at this point to note some facts which the majority has overlooked. First, Mrs. Pajak had only a tenth-grade education, and her work experience as a retail clerk was not sophisticated. Second, she was asked to sign the antenuptial agreement one day before the wedding. The matter was first brought to her attention when, as she was riding to work with her then fiance, he advised her it was necessary to stop by his attorney's office to sign some papers.

Upon arrival at the attorney's office, Mrs. Pajak was asked to sign the agreement, after which the attorney went over the document briefly with her. She did not get to read the document, nor was she informed that she could have another attorney review it for her benefit. Mrs. Pajak stated in her pretrial deposition that there were a number of words and phrases in the agreement which she did not understand.[5]

Furthermore, neither the attorney nor Mr. Pajak ever advised Mrs. Pajak, even

---

house, the Carolina Furniture Company, and a car. 182 W.Va. at 33, 385 S.E.2d at 389.

**4.** Syllabus Point 3 of *Bramer* states: "But neither the husband nor wife should be deprived thereby of his or her respective marital rights in the other's property to a greater extent than is clearly manifested by the plain words of the instrument or by necessary implication therefrom."

**5.** These included the following:
(1) "first hereinabove set forth";
(2) "contemplate";
(3) "dower";
(4) "statutory";
(5) "waive";
(6) "relinquishes";

(7) "with the same effect as though no marriage had taken place between the parties to this agreement";
(8) "mutually";
(9) "solely by virtue of said marriage";
(10) "shall have or acquire any right";
(11) "title or claim";
(12) "descend";
(13) "vest";
(14) "heir-at-law";
(15) "legatee";
(16) "devisee";
(17) "statute";
(18) "binding upon them";
(19) "cognizant";
(20) "execute";
(21) "in consideration of the premises"; and
(22) "disclaim or release."

generally, as to Mr. Pajak's assets, which were extensive and worth approximately $570,000.[6] She was not informed that by executing the agreement, she was giving up her right to dower and her statutory share in her husband's estate under W.Va. Code, 42–3–1. The agreement made no provision for Mrs. Pajak except that her husband would not claim an interest in her assets, which Mrs. Pajak valued at between $6,000 and $8,000.

Turning to an analysis of the *Gant* factors, it is clear that this agreement is void. The testimony is that while Mrs. Pajak signed the agreement, she did so without any relevant explanation from her husband's attorney of what she was giving up. The fact that she had no advance warning of the agreement until she was taken to her husband's attorney's office the day before the wedding undercuts a claim of voluntariness. Furthermore, Mrs. Pajak received absolutely nothing under the antenuptial agreement. As stated in 41 Am. Jur.2d *Husband and Wife* § 298 (1968), the adequacy of the provision for the wife bears upon the fairness of the agreement: "However, adequacy of the provision for the wife is to be considered in connection with the question whether the contract is fair, and inadequacy may give rise to a presumption of fraud vitiating the agreement." (Footnotes omitted). *See* Annot., 27 A.L.R.2d 883 (1953).

Moreover, it seems axiomatic that to have knowledge of the agreement's contents, as *Gant* requires, there must be some reasonable disclosure of the husband's assets or at least a showing that the prospective wife had some independent knowledge of these facts. Neither condition exists in this case. *Gieseler's* command that "it is the duty of the prospective

husband to fully disclose the amount of his property" was surely violated in this case.[7] This statement from *Gieseler* reflects the general view elsewhere, as summarized in 41 Am.Jur.2d *Husband and Wife* § 296 (1968):

"Antenuptial settlements and agreements are governed by the principle that an engagement to marry gives rise to a confidential relationship between the prospective spouses. They cannot with respect to such a settlement or agreement be regarded in the same category as ordinary buyers and sellers or as persons dealing with each other at arm's length. It is the duty of each to be frank and unreserved in the disclosure of all circumstances bearing on the settlement or agreement. Overreaching, or abuse of the confidential relation between prospective spouses, makes an antenuptial settlement or agreement voidable. Such a settlement or agreement, to be enforceable, must be fair, equitable, and reasonable in view of the surrounding facts and circumstances. It must also be entered into voluntarily, with full or at least fair and adequate knowledge of the facts, and in the utmost good faith on the part of both." (Footnotes omitted).

If we combine the foregoing with the fact that Mrs. Pajak was not advised nor given the opportunity to consult with her own lawyer about the agreement, the total unfairness is even more apparent. A number of cases involve fact patterns substantially similar to this case, i.e., lack of disclosure of assets, inadequate consideration to the wife, and a sudden request for an agreement with no time for the wife to talk to an attorney. Courts confronted with this fact pattern have had no difficulty in voiding the antenuptial agreement. *E.g.,*

---

6. These assets included several rental properties, which generated approximately $30,000 in rental income each year, several parcels of undeveloped land, and a home valued at $130,000. Mr. Pajak's entire real estate holdings were valued at approximately $500,000. He also had bank accounts and certificates of deposit worth approximately $56,000.

7. I find Syllabus Point 2 of the majority opinion to be almost unintelligible. What is meant by "a general idea of the other party's financial

condition" and "there was no fraud or concealment that had the effect of inducing the party to be charged into entering an agreement that otherwise would not have been made?" The two concepts are self-defeating. Concealment is the most common technique practiced by the wealthy prospective marriage partner. There is no desire to disclose assets for fear that the other spouse will not want to forego all claims to it.

*Lutgert v. Lutgert,* 338 So.2d 1111 (Fla. App.1976), *appeal after remand,* 362 So.2d 58 (Fla.App.1978), *cert. denied,* 367 So.2d 1125 (Fla.1979); *Britven v. Britven,* 259 Iowa 650, 145 N.W.2d 450 (1966); *Estate of Benker,* 416 Mich. 681, 331 N.W.2d 193 (1982); *Zimmie v. Zimmie,* 11 Ohio St.3d 94, 11 Ohio B.R. 396, 464 N.E.2d 142 (1984); *Re Marriage of Norris,* 51 Or.App. 43, 624 P.2d 636, *review denied,* 291 Or. 151, 634 P.2d 1345 (1981); *Re Estate of Crawford,* 107 Wash.2d 493, 730 P.2d 675 (1986). *See generally* Annot., 27 A.L.R.2d 883 (1953).

I regret to say that today's opinion does not befriend the widow who believes that justice requires a prospective husband, in the words of *Gieseler,* "to fully disclose the amount of his property and to deal fairly with his prospective bride." 117 W.Va. at 432, 185 S.E. at 848.

For these reasons, I dissent.