[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff has filed for a dissolution of her marriage with the CT Page 2820 defendant. Based upon the evidence presented at a contested hearing in this matter, the court makes the following findings.
The plaintiff and the defendant married on August 23, 1986 in Guilford, Connecticut. The marriage was the defendant's second marriage and the plaintiff's first marriage. The parties have one minor child, Alexandra, age seven, who is issue of the marriage. The defendant also has two adult children from his prior marriage.
The plaintiff is fifty years old and in good health. The plaintiff has an associate of fine arts degree. She is not currently employed. In the past, the plaintiff has worked as a real estate agent. She did so prior to her marriage to the defendant and for the first ten years of the marriage. She stopped working in 1995 to be home with the parties' daughter, who was then two years old.
The plaintiff holds a one-half interest in the marital home at 856 Boston Post Road, Madison, Connecticut. The court finds the fair market value of the marital home to be $1,600,000. The home is presently encumbered by a mortgage and a home equity loan totaling $385,000. The net value of the plaintiff's one-half interest is $607,500. The defendant owns the other one-half interest in this property. The home was purchased by the parties in 1987 for $910,000. The entire down payment of $400,000 was paid by the defendant. In addition, approximately $400,000 worth of renovations were subsequently made to the home and paid for by the defendant.
The plaintiff also owns stocks, bonds and mutual funds worth approximately $112,000 which were acquired through the sale of real property that the plaintiff owned before her marriage to the defendant. The plaintiff also possesses an IRA valued at $110,000 which was primarily funded prior to the marriage. The plaintiff's liabilities as reflected on her financial affidavit total $41,590.
The defendant is fifty-eight years old and also in good health. The defendant is a retired dentist. For approximately thirty years, the defendant operated a dental practice with offices in Madison and Guilford, Connecticut. On July 1, 2000, the defendant completed the sale of his dental practice, William J. Pite, D.D.S., P.C., to Dr. Thomas P. Petrick. Pursuant to a stock purchase agreement, the defendant will receive $320,250 together with interest at the rate of 7.88 per cent payable on a monthly basis over a ten-year period beginning July 1, 2000. On July 1, 2000, the defendant also began providing consulting services pursuant to a consulting and noncompetition agreement with Dr. Petrick. The agreement provides that the defendant will not engage in the practice of dentistry in the immediate area prior to June 30, 2010. Under the CT Page 2821 agreement, the defendant will receive $85,800 annually for a ten-year period. The defendant anticipates earning an additional $25,000 per year consulting.
In 1995, the defendant created the Pite Family Limited Partnership. The defendant was the sole general partner with a 2% interest and two trusts established for each of the defendant's adult daughters from his previous marriage, Jessica Lynn Pite and Rebekah Elizabeth Pite, were limited partners, with each trust holding a 49% interest in the partnership. Two properties owned by the defendant and acquired prior to his marriage to the plaintiff were transferred to the partnership: real property at 157 Goose Lane, Guilford, Connecticut and real property at 25-27 Boston Street, Guilford, Connecticut. The Boston Street property has since been sold and the remaining principal asset of the trust is the property at 157 Goose Lane. The partnership was created by the defendant for estate planning purposes.
The partnership agreement for the Pite Family Limited Partnership was amended on September 25, 1998 to allow the admission of the Pite Associates Revocable Trust as a General Partner. The defendant is the trustee of the Pite Associates Revocable Trust. On October 23, 1998, the trusts for the defendant's daughters, Jessica and Rebekah Pite, were terminated and each daughter became a limited partner of the partnership in her individual capacity.
On September 25, 1998, the defendant also established three additional entities: (1) the WJP Associates Limited Partnership; (2) the William J. Pite Grantor Retained Annuity Trust; and (3) the William J. Pite Qualified Personal Residence Trust. The general partners of the WJP Associates Limited Partnership were the defendant and the WJP Associates Revocable Trust, of which the defendant is the grantor and trustee. The limited partners of the WJP Associates Limited Partnership are the defendant, the William J. Pite Grantor Retained Annuity Trust, the Alexandra Victoria Pite Minors Trust, Rebekah Elizabeth Pite and Jessica Lynn Pite. The defendant transferred $2,250,000 of his assets to the WIP Associates Limited Partnership. The assets consisted of the following items: $1 million cash; property at Willard Avenue, Madison, Connecticut valued at $500,000; real property in Vermont worth $150,000; real property in Florida valued at $350,000; and a one-half interest in 41 Hotchkiss Lane, Madison, Connecticut worth $250,000. Each of the pieces of real property transferred by the defendant to the partnership was acquired by him prior to his marriage to the plaintiff
The defendant funded the William J. Pite Grantor Retained Annuity Trust with a limited partnership interest in the WJP Associates Limited Partnership in the face amount of $1,800,000. The term of the William J. CT Page 2822 Pite Grantor Retained Annuity Trust is twenty years and it will pay the defendant an annual annuity of $111,516.84. After the termination of the annuity period, the principal of the trust is to be divided among the defendant's three daughters.
The defendant transferred to the William J. Pite Qualified Personal Residence Trust his one-half interest in the marital home at 1856 Boston Post Road, Madison, Connecticut. The defendant is the trustee of the trust. This trust gifts the defendant's interest in the property to his three children and he retains use of the property for twenty years. The defendant did not discuss this transaction with the plaintiff or inform her of his intent to form the trust prior to its creation. Although the defendant executed a deed transferring his one-half interest in the marital home to the trust, the deed was never recorded.[1]
The effect of the defendant's transactions involving the three entities known as the WJP Associates Limited Partnership, the William J. Pite Grantor Retained Annuity Trust, and the William J. Pite Qualified Personal Residence Trust was to transfer out of his name assets with a current value of approximately $3,380,000. The defendant however remained in control of these assets because he retained control of each entity.
The parties dispute the defendant's motivation in creating these entities and transferring his assets to them. The defendant asserts that he created the limited partnership and the two trusts for estate planning purposes. He wanted to minimize estate taxes and maximize his children's inheritance upon his death. The plaintiff contends that the defendant was involved with another woman at the time of the creation of these entities and the defendant's intent was to prevent the plaintiff from obtaining any interest in his assets should their marriage dissolve.
Based on the evidence presented, I find that the defendant, in establishing the partnerships and trusts and transferring his assets to them, was in large measure motivated by a desire to insure that the plaintiff could not secure an interest in these assets upon his death or their divorce. Although the plaintiff had signed a prenuptial agreement with the defendant relinquishing her rights to the defendant's property, the defendant took these steps to guarantee that his property was placed outside the plaintiffs reach whatever the validity of the prenuptial agreement. The timing of the creation of the partnerships and trusts and their breadth, coupled with the lack of disclosure to the plaintiff, evidence an intent to extinguish any right the plaintiff had to the defendant's assets.
The defendant's current income is as reflected on his financial affidavit dated October 24, 2000. He receives $111,517 annually from the CT Page 2823 William J. Pite Grantor Retained Annuity Trust, $85,800 from the consulting and non-competition agreement with Dr. Petrick, $45,000 annually from partnership and trust income, $25,000 annually for consulting, and $46,500 annually from the sale of his dental practice. The defendant's total gross annual income is $313,817.
The defendant currently possesses an interest valued at time of trial at $4,680,844 in a profit-sharing plan, an IRA worth $134,055, a life insurance policy with cash value of $72,000, a checking account with a balance of approximately $10,000 and antiques worth approximately $450,000.
Each party claims that the other is at fault for the breakdown of the marriage. The plaintiff claims that the defendant verbally abused her and engaged in an extramarital affair. The defendant contends that the plaintiff exhibited frequent temper tantrums, abused alcohol and prescription medication and argued with the defendant over finances. The court finds based on the evidence presented that the actions of both parties contributed to the breakdown of the marriage and neither party is singularly at fault for the breakdown.
The parties also disagree over whether the plaintiff should be expected to return to work as a real estate agent after the dissolution of their marriage. The plaintiff asserts that she is not able to return to work because she needs to be home to care for her daughter. The defendant contends the child is now in school, the plaintiff has a housekeeper and a caretaker, and there is no need for the plaintiff to be at home all day every day. While the decision whether to return to work is ultimately the plaintiffs, it is reasonable to expect her to return to work and to impute an earning capacity based on her ability to regain employment as a real estate agent in determining the appropriate financial orders in this case. The plaintiff still possesses a real estate license and Alexandra's full-time enrollment in school enables the plaintiff to now return to work. The plaintiff averaged approximately $22,500 in annual income from employment as a real estate agent during her last five years of employment. The court, therefore, imputes an earning capacity for the plaintiff of $22,500 annually.
The major battleground in this action centered around a prenuptial agreement signed by the parties prior to their marriage. The defendant seeks to enforce the prenuptial agreement while the plaintiff claims that the agreement is invalid. The plaintiff asserts that the prenuptial agreement is unenforceable because the defendant failed to fully disclose his assets and because it would be unconscionable to enforce the provisions of the agreement given the current circumstances of the parties. CT Page 2824
The prenuptial agreement signed by the parties is dated August 15, 1986. It provides that each of the parties "shall separately retain all rights in his or her own property, whether now owned or hereafter acquired . . ." The agreement also provides that neither party "shall seek or obtain from the other alimony or support, temporary or permanent, attorneys' fees or any part of the estate of the other, including any rights in pension or retirement plans."
The prenuptial agreement also stated that "the nature and extent of the holdings of the wife have been disclosed to the husband and have been summarized in `Exhibit A' which is attached hereto and made a part hereof; and the nature and extent of the holdings of the husband have been disclosed to the wife and have been summarized in `Exhibit B' which is attached hereto and made a part hereof." Both Exhibit A and Exhibit B were attached to the prenuptial agreement; however, both were entirely blank except for the headings: "Property of Faith C. Whitehead" and "Property of William J. Pite," respectively.
The defendant insisted on a prenuptial agreement prior to marrying the plaintiff. The plaintiff, however, was reluctant to enter into such an agreement. The parties had numerous conversations concerning the issue over several months before the drafting of the agreement. Eventually, they met with Attorney Basil Duncan, who drafted the prenuptial agreement on behalf of the defendant.
On August 21, 1986, the plaintiff consulted with Attorney William Childress with respect to the prenuptial agreement. Attorney Childress advised the plaintiff that pursuant to the prenuptial agreement she was waiving her right to property owned by the defendant and her right to alimony. He also noted that the schedules of the parties' assets were not attached to the agreement. Attorney Childress advised the plaintiff that full disclosure to each party of the other's assets and the attachment of the schedules to the agreement were essential to the validity of the agreement.
The parties had signed the prenuptial agreement prior to the plaintiff's meeting with Attorney Childress. After consulting with Attorney Childress, the plaintiff indicated that she wished to enter into the prenuptial agreement. She then reaffirmed her signature on the document and asked Attorney Childress to witness her signature and take her acknowledgment, which he did.
The existing statute in Connecticut which controls the enforceability of premarital agreements, the Connecticut Premarital Agreement Act, General Statutes § 46b-36a et seq., does not apply to any premarital CT Page 2825 agreement made prior to October 1, 1995. General Statutes § 46b-36j. Accordingly, the determination of the validity of the parties' prenuptial agreement in this case is governed by the common law.
The seminal case concerning premarital agreements is McHugh v. McHugh,181 Conn. 482 (1980). In McHugh, the Connecticut Supreme Court for the first time set forth the standards for determining the validity of a prenuptial agreement in Connecticut. "The validity of an antenuptial contract depends upon the circumstances of the particular case. Antenuptial agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the dissolution of the marriage, are generally enforceable where three conditions are satisfied: (1) the contract was validly entered into; (2) its terms do not violate statute or public policy; and (3) the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice." (Citations omitted.) Id., 485-486.
The plaintiff contends that the parties' premarital agreement is invalid because it fails to satisfy the first and the third conditions established in McHugh. Specifically, the plaintiff asserts that the defendant failed to fully disclose his assets at the time the premarital agreement was executed. She claims that the failure to provide her with a written list of assets or to append one to the agreement is fatal. The plaintiff also asserts that the prenuptial agreement was unconscionable when executed because of its disparate allocation of wealth and that it is unconscionable now due to the birth of a child and the substantial increase in the defendant's assets.
The defendant defends the validity of the prenuptial agreement. He asserts that the plaintiff was provided with a written schedule of the defendant's assets and that the plaintiff possessed independent knowledge of his assets. The defendant also rejects the plaintiff's claim that the agreement is unconscionable, asserting that child support will provide for the needs of the child and the increase in his wealth is within the range of what would be expected over a fourteen-year period.
Based on the evidence presented, I find that the plaintiff lacked sufficient information as to the defendant's assets and liabilities necessary for the extensive waiver of rights contained in the subject prenuptial agreement.[2]
The Connecticut Supreme Court in McHugh declared that a trial court's first inquiry is to determine whether the circumstances surrounding a premarital agreement's execution are such "as to demonstrate that the CT Page 2826 parties were aware of their legal rights and their respective assets and liabilities, and proceeded by the agreement to alter those rights in a fair and voluntary manner." Id., 488. McHugh mandates that an essential prerequisite to a valid premarital agreement is that each party be fully aware of the assets and liabilities of the other party. Id., 486-487. The requisite financial information may be acquired either through full disclosure by the other party or one's own independent knowledge. Id.
The prenuptial agreement in this case states that it includes exhibits summarizing the assets of the parties. Attorney Duncan told both parties to prepare a list of their assets to attach to the prenuptial agreement. Both parties agree that no schedule of assets of either party was ever attached to the prenuptial agreement. The defendant, however, claims that he compiled a list of his assets prior to the signing of the prenuptial agreement and that he provided the list to the plaintiff. The plaintiff denies that she ever received a list of the defendant's assets. Based upon the evidence presented, I find that the plaintiff never received from the defendant a written schedule of the assets that he owned prior to the marriage. The defendant failed to affirmatively inform the plaintiff, either orally or in writing, of the amount, character and value of his assets.
The defendant also claims that the plaintiff possessed sufficient independent knowledge of the defendant's assets and liabilities to validate the waiver of her rights to alimony and to his property. The parties dispute the precise extent of the plaintiff's independent knowledge at the time of the execution of the premarital agreement. I find based on the evidence that while the plaintiff knew that the defendant was a dentist with a lucrative dental practice, she did not know the amount of his annual income. The plaintiff also knew that the defendant owned specific parcels of real property and, given her experience as a real estate agent in Connecticut, she had a general idea of the fair market value of those properties located in Connecticut. However, the plaintiff did not know the fair market value of the properties owned by the defendant in Florida or in Vermont. She also did not have independent knowledge of any mortgages or other encumbrances on any of the properties owned by the defendant and did not know the defendant's net equity in any of the properties. Finally, the plaintiff was not aware of the value of the defendant's personal savings or his pensions or retirement plans at the time of the signing of the prenuptial agreement.
According to the terms of the prenuptial agreement signed by the plaintiff, she gives up all her rights to the property held by the defendant, all her rights to his pensions or retirement plans and all her rights to alimony. Before she can be charged with a knowing and CT Page 2827 intelligent waiver of these extensive and important rights, she needs to fully understand the value of that which she is surrendering. McHugh v.McHugh, supra, 181 Conn. 486-487. Because the plaintiff did not know the defendant's annual income, the net value of his many real estate holdings, the value of his personal savings or the value of his retirement plans, she did not knowingly waive her rights to these assets upon the dissolution of the marriage.
The substantial nature of the defendant's income and assets in 1986 heightens the need for full and complete disclosure. Based on the defendant's 1986 tax return and the schedule of the defendant's 1986 assets submitted by the defendant at trial, the defendant at the time of the marriage received income from his dental practice of $293,000; owned real estate with a total net equity of $2,699,297; possessed personal savings totaling $699,607; owned a business with $298,861 in assets and possessed pension plans worth $905,371. The prenuptial agreement signed by the parties mandates that the plaintiff surrender then and forever all interest in each of these considerable assets.
The defendant argues that one party's general knowledge of another's wealth and assets is sufficient to validate a premarital agreement. The defendant cites caselaw from a number of jurisdictions to support his position. See Harbom v. Harbom, 134 Md. App. 430, 760 A.2d 272 (2000),Pajak v. Pajak, 385 S.E.2d 384 (W.Va. 1989), and Laird v. Laird,597 P.2d 463 (Wyo. 1979). See also In Re Estate of Lopata, 641 P.2d 952
(Colo. 1982) and In Re Estate of Thies, 273 Mont. 272, 903 P.2d 186
(Mont. 1995). The common law in Connecticut as established by the Connecticut Supreme Court does not support the defendant's claim that the plaintiff's general understanding that the defendant was a wealthy dentist with substantial real estate holdings is adequate to sanction their premarital agreement. The burden is on each party to provide "full disclosure of the amount, character and value" of the parties respective assets. McHugh v. McHugh, supra, 181 Conn. 487. General knowledge of a party's financial condition is insufficient to satisfy the obligation of full disclosure generated by the confidential relationship between prospective spouses.[3] See Schumacher v. Schumacher, 131 Wis.2d 332,388 N.W.2d 912 (Wis. 1986) (The court held that general or approximate knowledge of assets is insufficient to validate a prenuptial agreement) and Friedlander v. Friedlander, 80 Wash.2d 293, 494 P.2d 208 (Wash. 1972) (The court affirmed the invalidation of a premarital agreement which provided only general disclosure of a spouse's assets).
The purpose of the disclosure requirement is to ensure an intelligent waiver of a party's statutory rights. McHugh v. McHugh, supra,181 Conn. 487. That purpose cannot be met by allowing a party to surrender his or her statutory rights to assets based on a mere general CT Page 2828 understanding of those assets.[4]
The defendant did not fully disclose his income or his assets to the plaintiff prior to the signing of the prenuptial agreement nor did the plaintiff have independent knowledge of the amount, character and value of the same. Under the circumstances of this case, the plaintiff lacked sufficient financial information to knowingly waive, upon dissolution of the marriage, her right to alimony, or her right to a division of the defendant's property and pension. Accordingly, the parties' premarital agreement waiving these statutory rights is invalid.[5]
In determining the orders contained herein, I have carefully considered all the relevant statutory criteria, including those in General Statutes § 46b-81 as they relate to the assignment of property and § 46b-82
as they relate to the award of alimony, and § 46b-84 and the child support guidelines as they relate to the award of child support. The court enters the following orders:
1. The marriage is ordered dissolved on the grounds of irretrievable breakdown.
2. In accordance with the agreement of the parties, the parties are awarded joint legal custody of the minor child, Alexandra, with primary physical residence of the child with the plaintiff. The defendant is awarded rights of reasonable and flexible visitation. Both parties are ordered to successfully complete the parenting education program within sixty days of this dissolution judgment.
3. The defendant shall pay child support to the plaintiff in the amount of $500 weekly.[6] The parties shall share equally the cost of any qualified child care and any unreimbursed medical expenses for the minor child. The defendant shall maintain medical insurance for Alexandra for so long as he is obligated to pay child support.
4. The defendant shall pay to the plaintiff periodic alimony in the amount of $1,500 weekly. Alimony shall terminate upon the death of either party, remarriage or cohabitation by the plaintiff, or the plaintiff's sixtieth birthday, whichever shall occur first. Alimony shall terminate on the plaintiff's sixtieth birthday because the plaintiff will then be able to support herself through the interest awarded to her by this judgment in the defendant's profit-sharing plan.
5. So long as the defendant is required to pay alimony to the plaintiff, he shall maintain $500,000 worth of life insurance, naming the plaintiff as beneficiary, and he shall provide annual confirmation to the plaintiff that the insurance is being maintained. So long as the defendant CT Page 2829 is required to pay child support, he shall maintain $250,000 worth of life insurance, naming the child as beneficiary, and he shall provide annual confirmation to the plaintiff that the insurance is being maintained.
6. The plaintiff is awarded the child dependency exemption for Alexandra for as long as the child resides primarily with her.
7. The plaintiff is awarded sole ownership of the marital home at 856 Boston Post Road, Madison, Connecticut. The defendant shall convey his interest in the property to the plaintiff by quitclaim deed within thirty days of the date of this decision.[7] The plaintiff shall be solely responsible for paying the mortgage, taxes, and liens, if any, on the property. The plaintiff shall hold the defendant harmless and indemnify the defendant with respect to any and all mortgages, liens and encumbrances on the property. The plaintiff shall take immediate steps to obtain, if possible, a refinancing of the current mortgage and home equity loan so that the defendant is no longer an obligor. The defendant shall vacate the marital home within fifteen days of the date of this order and the plaintiff shall have exclusive possession thereof.
8. The plaintiff shall retain ownership of the stocks, bonds and mutual funds and the IRA listed on her financial affidavit. The plaintiff is awarded sole ownership of the 1994 Mercedes automobile she presently drives and the defendant is ordered to convey clear title of the automobile to the plaintiff.
9. The defendant shall retain his interest in the IRA, his interest in the checking account and the cash value of his life insurance policy listed on his financial affidavit. The defendant is awarded sole ownership of the 1996 Mercedes automobile listed on his financial affidavit.
10. The plaintiff is awarded an interest in the amount of $1,887,736 in the profit-sharing plan held by the defendant. This figure represents one-half of the current value of the profit-sharing plan after deducting the value of the plan at the time of the marriage ($905,371). The plaintiff shall draft, if necessary, a Qualified Domestic Relation Order (QDRO) to effectuate this award. The draft shall be submitted to the defendant for his review and to the court for its approval. The court shall retain jurisdiction in order to enforce this provision.
11. The parties shall share equally the antiques bought by the parties during the marriage. Each of the parties is hereby awarded ownership of the furniture and personal property brought into the marriage by that party. All other furnishings and personal property shall be shared equally CT Page 2830 by the parties. The parties are hereby referred to Family Relations for mediation of these issues. The court will retain jurisdiction to resolve any disputes on these issues.
12. The defendant shall maintain medical insurance for the plaintiff for a period of one year.
13. Each of the parties shall be solely responsible for payment of the liabilities listed on their respective financial affidavits.
14. Each of the parties shall be responsible for the payment of their respective attorney's fees.
BY THE COURT
Judge Jon M. Alander