IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 18, 2017 Session

## RHONDA SUE GRIFFIS GRUBB v. JAMES WESLEY GRUBB

**Appeal from the Chancery Court for Roane County**
**No. 2015-5     Frank V. Williams, III, Chancellor**

_____

**No. E2016-01851-COA-R3-CV**

_____

This appeal arises from a divorce. Rhonda Sue Griffis Grubb ("Wife") filed for divorce against husband James Wesley Grubb ("Husband") in the Chancery Court for Roane County ("the Trial Court"). Trial in this matter was bifurcated. The validity of the parties' antenuptial agreement ("the Agreement") was tried first. The Trial Court found that the provision in the Agreement purporting to cap Wife's alimony was unenforceable but otherwise upheld the Agreement. Later, trial was conducted on the remaining issues in the case. Citing her adultery and a clause in the Agreement, the Trial Court declined to grant Wife alimony. However, the Trial Court awarded Wife a substantial portion of the marital estate. The Trial Court also ruled upon child support, parenting time, and education for the parties' two daughters. Husband appealed to this Court raising numerous issues. Wife raised additional issues of her own. We find and hold that Husband failed to carry his burden as to the validity of the Agreement. As to the second stage of this bifurcated matter, we find that the Trial Court's final judgment is devoid of factual findings to such a degree that we cannot effectively review the remaining issues in this case. We reverse as to the validity of the Agreement. We vacate and remand for further proceedings as necessary and for entry of a new final judgment containing detailed factual findings and conclusions of law as to the remaining issues.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed, in Part, and Vacated, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S. and THOMAS R. FRIERSON, II, J., joined.

C. Scott Taylor and Margo J. Maxwell, Knoxville, Tennessee, for the appellant, James Wesley Grubb.

Browder G. Williams and Julianna L. Mason, Kingston, Tennessee, for the appellee, Rhonda Sue Griffis Grubb.

# OPINION

## Background

Husband and Wife married in 2002. There was a significant gap in the parties' ages as well as their educational, employment, and business backgrounds. Wife was born in 1982. Husband is 22 years older than Wife. Wife earned her G.E.D. in 2000. Husband graduated from college in 1985. Husband worked in his rent-to-own business and sold furniture, electronics and appliances. Husband met Wife around 2000 when Husband took his clothes to the dry cleaners where Wife worked. Husband and Wife began a relationship. Wife soon thereafter moved in with Husband and stopped working at the dry cleaners. Husband provided for them both, and Wife soon became financially dependent on Husband. Husband proposed to Wife in 2001. Husband, who had been married once before, desired an antenuptial agreement with Wife.

In August 2002, Husband took Wife to his family lawyer to sign the Agreement. This was two days before the couple was to go on vacation and be married. The accounts of this meeting are in contention. Wife states that she did not fully understand what she was signing. Wife was informed that the Attorney, Chris Trew, was not her attorney and that she could get independent legal advice if she wished to do so, something she never did. Wife signed the Agreement, and the couple shortly thereafter left on their vacation as planned and got married.

The Agreement purported to safeguard Husband's business interests and contains the following relevant provisions:

> WHEREAS, the parties desire that all property now owned by each of them, and any increase or appreciation in the value of such property, plus any additions derived with income therefrom or any replacement thereof, shall be free from any claim of the other that may arise by reason of their contemplated marriage.

*** 

> 1. <u>Property to be Separately Owned</u>. After the solemnization of the marriage between the parties hereto, each of them shall separately retain individual ownership and all rights in and to his or her own real and/or personal properties, now owned, or hereafter acquired as a replacement of their presently owned separate property, and any increase or appreciation in the value of such separate property during the marriage, all of which is herein referred to as "separate property".

***

The "separate property" presently owned by each of the parties is as set forth herein, to-wit:

a) The presently owned "separate property" of James Wesley Grubb consists of the assets described in Exhibit "A", attached hereto, which Exhibit "A" has been dated and signed by both parties; and

b) The presently owned "separate property" of Rhonda Sue Griffis consists of the assets described in Exhibit "B", attached hereto, which Exhibit "B" has been dated and signed by both parties.

***

3. <u>Waiver upon Dissolution of Marriage</u>. In the event of the dissolution of the marriage by divorce, annulment or otherwise, or in the event of a separation of the parties pursuant to a judicial decree of separation or otherwise, except to the extent otherwise specifically provided for herein:

a) Neither party will make a claim arising out of or based upon their marriage or dissolution of their marriage to any part of the real and/or personal property and/or estate, or any increase in the value thereof, classified as the separate property herein, of the other party;

b) Each party hereby waives and relinquishes any claim such party may have arising from the marriage and/or from any such dissolution of the marriage against the real and/or personal property and/or estate, or any increase in the value thereof, classified as the separate property herein, of the other party;

c) All of the separate property, or any increase in the value of such separate property, of each party shall be retained by the party whose separate property it is, and shall not be deemed marital property under Tennessee law for any purpose.

d) Neither party will be responsible for any of the personal debts of the other party;

e) Neither party shall be entitled to claim or receive alimony of any nature or kind from the other party except as provided hereafter.

The rights waived hereby and the provisions hereof are intended to be effective under the laws of the State of Tennessee where the parties now reside and are intended to cover any such similar rights of a divorced spouse under the laws of any other state in which the parties may hereafter reside.

-3-

***

In the event the parties have been married for greater than five (5) years prior to the filing of a Complaint for Divorce, James Wesley Grubb shall pay to Rhonda Sue Griffis the sum of One Hundred Thousand Dollars and 00/100 ($100,000.00) as alimony in solido for her use in purchasing a residence. This sum is not subject to modification for any reason. This sum shall be due within ninety (90) days of the entry of any final Decree of Divorce and until payment thereof, Rhonda Sue Griffis, shall have the right to reside in the Kingston, Roane County, Tennessee, residence. Upon payment of this sum, she shall vacate the residence within sixty (60) days.

Husband and Wife had two children, both daughters, over the course of their marriage. Wife served as homemaker while Husband continued working in his business. The daughters attended private school. Over time, problems developed in the marriage. Wife would testify to arguments the couple had over the upbringing of their daughters and that Husband was very distant from Wife. Wife filed for divorce in January 2015.

Trial in this case was bifurcated. First, at an October 2015 hearing, the issue of the validity of the Agreement was tried. Husband, Wife, and Howard Chris Trew ("Trew"), the attorney who drafted the Agreement, all testified.

Trew had drafted antenuptial agreements throughout the course of his 30-plus year legal career. Trew had known and worked with Husband's family for some time. In July 2002, Trew sent Husband a form version of an antenuptial agreement for him to review. Husband's accountant faxed Trew Husband's financial statement. Trew then prepared a draft agreement before finalizing the Agreement. The Agreement was executed at Trew's office on August 26, 2002. Husband made the appointment. Trew never before had met Wife. Trew met with Wife one-on-one for at least 30 minutes to go over the Agreement. Trew acknowledged Wife's youth and took this into account in how he discussed the Agreement with her. Trew testified: "I knew there was a disparity in wealth, obviously, and rather than -- he may have thought when he first wanted this that what's mine is mine and that's it, but I told him that he needed to provide some things for her, such as housing, and provide her with some alimony, depending on the length of the marriage." Trew stated that he believed the Agreement was fair to Wife. Regarding whether Wife knew she could seek her own counsel, Trew testified: "I would have told her in this meeting that she had a right to seek legal counsel, yes, sir. And I certainly would have told her, and she knew that anyway, that I was representing [Husband]. Again, I had never met this young lady before that day." Trew, when asked about Wife's demeanor at the meeting, testified: "I am very comfortable in stating under oath today,

-4-

that if that young lady was crying or emotional during my conference with her, I would have called [Husband] in to say, 'Look, I'm sorry, she's upset today. I don't know what has happened in the past, what's on her mind, but we're not signing this document today. She needs to go out and seek an attorney' . . . I would have never let this young lady sign this agreement if she was crying . . . ." Trew stated that he went over the worth of Husband's assets with Wife. On cross-examination, Trew stated: "My job was to prepare a document that protected his interests, but to also prepare a document that I thought would be enforceable." Trew could not recall whether he knew that Husband and Wife were leaving in two days for vacation to get married. Trew stated that he did not believe it would have been appropriate to tell Wife she could bargain with Husband over the Agreement, stating: "There's a fine line between trying to go over something with somebody and giving them advice, and you don't want to cross that line."

Husband, age 55, testified. Husband had graduated college with a degree in zoology in 1985. Husband stated: "After I graduated UT, I went into business in Rockwood with my brother, in the Rent To Own business." When Husband first met Wife at the dry cleaners, Husband was 40 and Wife was 18. In late 2001, Husband proposed to Wife. Husband testified that Wife knew and understood he wanted an antenuptial agreement. Husband paid for everything after Wife moved in with him. Husband stated that he had discussions with Wife during their engagement about an antenuptial agreement and possibly paying for her to get her own attorney to counsel her. Husband testified as follows:

> Q. All right. And there's a reference, you're a man of a list -- you had a list you were trying to get done before you left town?
> A. Yes. Yes, I did.
> Q. And had you shared that list with your wife?
> A. Yes.
> Q. And on that list was going to Chris Trew's Office?
> A. Yes.
> Q. To execute the prenuptial agreement?
> A. Yes.
> Q. Now, at this time, even at this date here, you've now got the final rendition, you've got the appointment on August the 26th, had you had a conversation with her during those days we've got this agreement, of course, it says it in here, about her getting an attorney and her -- you paying for it?
> A. Most definitely we had that conversation. I wanted her to feel comfortable and not to worry about the expense of it to go get her own attorney and her own counsel.

Q. All right. And the day that you went to Chris' office, do you remember what time of day it was?

A. I would guess it was morning when we went to Chris' office.

Q. Did you all go together?

A. We did.

Q. And what was her demeanor going to the office?

A. I mean we were elated, we were excited to be getting married.

Q. Was she in any way emotional, crying, anything of that nature?

A. No.

Q. Was she complaining about having to go sign a prenuptial agreement?

A. No. No, sir.

Q. And what happened when you got to Chris Trew's office?

A. When we got to Chris Trew's office, Chris came out into the lobby where we were at, and I very briefly chit-chat, "How are you doing? Doing good." And he said, "Jim, if you will, just remain here, I want to talk to Rhonda alone." And then they exited and went to his, I assume his conference room, that's where they went, was to his conference room.

Q. And how long did he meet with her in his conference room?

A. I would say, and I remember this because I expressed it to Rhonda, you know, we were -- "You know, you guys were there -- back in there 45 minutes or an hour." It was a long wait sitting out there. I didn't expect that to be that long. But I sat out in his lobby by myself and I remember tapping my feet and -- it took a long time.

Q. And when you say you asked Rhonda "what happened back there, what took so long," what was her remark?

A. Well, when we left, she made the comment to me that Chris had said to her that, "Why are you signing this? Are you going to sign this because you know it's not going to last, you know your marriage isn't going to last?" And I think Chris said that jokingly. She said they went over the agreement, the prenuptial agreement.

Q. And, again, by this time, was she in tears or upset or --

A. No, no, no, we were elated, we were getting married.

Q. Ever any objection from her about signing this prenuptial agreement?

A. I'm sorry?

Q. Was there ever any objection by her --

A. No.

Q. -- to signing this prenuptial agreement?

A. No.

Q. And in terms of the rest of the day, do you recall what you all did?

A. We -- I don't really recall. I mean, obviously, we were getting things off our list, we were getting ready to go to Vancouver.

Q. And then that was the 26th, and then you actually flew out on the 28th, correct?
A. I believe that to be true, yes.
Q. And you all flew to Vancouver, got married on the 30th of August?
A. That's correct.
Q. And then went on a seven-day cruise?
A. That's correct.

On cross-examination, Husband continued his testimony:

Q. You agree, of course, that you were 22 years older than your wife, correct?
A. Yes.
Q. She was 20 years old and had just turned 20 a month before when you signed or when you all signed this agreement, correct?
A. Yes.
Q. Okay. You had been in business since 1985, correct?
A. I worked for my brother at that time. Shortly after that, I went into business, in my view. I went into business shortly after that.
Q. Okay. And you had developed several businesses that are described, and you told us how many stores and all that stuff, that were owned by you at the time of your marriage, correct?
A. Yes, me and my team, not necessarily me, but me and my team, yes.
Q. All right. And your wife, as you mentioned before, was working at a dry cleaners at the time you met her, correct?
A. Yes.
Q. And shortly after you all moved in together, she ceased to work at the dry cleaners, correct?
A. We didn't move in together. She moved in with me, and the follow up on that was what now?
Q. She was working at a dry cleaners and she quit that shortly after she moved in with you?
A. Shortly, yes.
Q. Okay. You have a college degree and you know your wife has a G.E.D. degree, correct?
A. Yes.
Q. This was your second marriage and she had never been married before?
A. Yes.
Q. You claim that you offered to pay for an attorney for her, is that not right?

A. Yes.

Q. You have no proof of that other than your statement; is that not fair?

A. That would be accurate, yes.

Q. You know, regardless of whether you offered, she had no independent legal advice when she entered into that agreement?

A. Yes, she declined.

Q. Okay. And Mr. Trew, when he testified, he was your family attorney and represented you and other family members, correct?

A. Yes.

Q. Mr. Trew's job in this matter was to protect your interests only, is that correct?

A. No, I would say his job was to educate me on the prenuptial agreement and for him and I to work together to form one.

Q. For your benefit, correct?

A. Of course, but for the fairness of it, too, as he alluded to.

Q. And you didn't show her this first draft that had more generous terms in it, did you?

A. I don't -- I don't know that I ever had that one. I don't believe I ever had that one. I believe that was a phone call when he and I were discussing what figures to put in it.

Q. Well, whether you had it or not, you know she never saw it, is that not correct?

A. Yeah, she never saw it.

Wife testified. Wife stated that Husband had broached the topic of an antenuptial agreement in the spring of 2002. Wife stated: "He said he needed to protect his brother or his brother wanted him to protect the business, something like that." Wife disputed much of Husband's testimony as to the circumstances leading up to the signing of the Agreement. There is some confusion in the testimony as to when exactly Wife first saw the final draft of the Agreement, but it was around two or three days before meeting Trew on August 26, 2002. Wife testified as follows:

Q. Your husband testified that he had told you that you should get your own attorney and that he would pay for it. Did you ever have any conversation like that with him?

A. No.

Q. Did he at any time offer to provide you with an attorney or make recommendations for an attorney for you or anything of that name?

A. No, we never talked about attorneys.

Q. Okay. When was the first thing you ever heard anything about you getting your own attorney, Ms. Grubb?

A. I believe it was when Chris was skimming through everything, he said, "Understand, I'm not your attorney, you can get your own attorney," and that was August --

Q. Was this on August 26th?

A. -- 26th.

Q. Of 2002?

A. Yes.

Q. And Chris, of course, is Mr. Trew, the attorney, Mr. Grubb's attorney?

A. Yes.

Q. Okay. Did you have anyone else that you talked to about this ante-nuptial agreement, other than Mr. Trew on August 26 and your husband on whatever day it was that you all talked in July or thereafter?

A. No.

Q. Why didn't you talk to your family members or anybody like that about it?

A. Well, I didn't have much time, but I -- I was -- I never talked -- my mom is the only person I really talked to and I didn't talk to her about much to do with him. It was -- I didn't want her to think badly of him, and that's later with other things throughout the marriage. But with that, when I realized what he was doing, I just -- I thought it was a little embarrassing.

Q. All right. So did you get any independent advice from any source before you signed the agreement?

A. No, I didn't.

Q. When did you find out -- when your husband had talked about the prenup and the ante-nuptial agreement, did you feel he was going to do one or did you know or what -- how did you feel about that, or what did you know about that?

A. I wasn't -- I didn't really believe he would go through with it. I thought -- I thought it was just something else he said. Because he also had planned to sell the house and buy property in Kingston and live in a doublewide, and he thought I'd have a problem with that. I said okay. Then he never -- he never did that. He always said things and it would never be brought up again.

***

Q. All right. Had you ever been to an attorney's office before?

A. No.

Q. Had you ever signed a legal document before?

A. No.

Q. And I'm talking about before August 26, 2002.

A. No.

Q. How did -- do you remember how you learned about the fact that he was going on that day to see Mr. Trew, on August 26?

A. He was going over his list and he told me we had to go by and sign it.

Q. How were you feeling when you went to Mr. Trew's office that day?

A. I remember that very clearly. I had extreme anxiety. I was nervous. I was upset the entire ride there and Jim told me everybody gets upset, it's being around attorneys, it will be okay. And he knew I was upset. I wasn't as upset in front of Chris. I'm sure he could tell I was nervous and upset, but I tried to not cry in front of him.

***

Q. When you met with Mr. Trew, can you recall whether or not you asked him any type of questions about what anything meant or what your options were or anything of that nature?

A. No, I don't believe so. That whole thing went very fast. I -- I thought we were -- it was rushed, I don't know if it was a last minute appointment. I don't know why, I just know we were in and out. I think it was under 45 minutes the -- the whole time.

On cross-examination, Wife testified as follows:

Q. In any event, in the spring of '02, he did bring [an antenuptial agreement] up, that's what you're telling us, correct?

A. Yes.

Q. That's the first time he brought up the term "prenup"?

A. Yes.

Q. Correct? And, basically, he said he wanted to protect his assets, his businesses, you knew he was in business with his brother, didn't you?

A. Yes.

Q. And you didn't have any objections to that, did you?

A. No.

***

Q. And in terms of your visit with Mr. Trew on August the 26th, you told us that you were with Mr. Trew maybe an hour, not less than 45 minutes, correct?

-10-

A. Correct. I said we were at the office no more -- I said an hour -- I know I told him, my attorney, that an hour would be generous on the amount of time we were there.
Q. And you told us that Jim left the room?
A. Yes.
Q. And then it was you and Mr. Trew to go over the ante-nuptial agreement, correct?
A. Right.
Q. And that he went over the ante-nuptial agreement with you, did he not?
A. Yes, he skimmed through it.
Q. And you said you cried while he was doing that, didn't you?
A. I did tear up. I was trying to not cry, just like I told you in depositions. You asked me and I said no, I was not hysterical, I was trying -- I did not want him to see me cry. That's -- I was trying to not cry. I was trying to get myself together before we even went in the office.

At a subsequent December 2015 hearing, the Trial Court ruled that provisions in the Agreement purporting to cap Wife's alimony were unenforceable. Otherwise, the Trial Court found the Agreement had been entered into by Wife knowingly, voluntarily, and without duress or undue influence. In its January 2016 order, the Trial Court stated, as pertinent:

1. The Ante-Nuptial Agreement was entered into by Plaintiff knowingly, voluntarily, without duress or undue influence and Defendant's assets totaling approximately $5,000,000 and his income approaching $500,000 at the time of the execution of the Agreement were sufficiently disclosed to Plaintiff at the time that she executed the Agreement.

2. However, the provisions of the Ante-Nuptial Agreement that attempt to cap what Plaintiff is to receive as alimony are unreasonable, invalid, and shall not be enforced. Instead, this matter shall be set for hearing to determine what amount of alimony Plaintiff should receive, which could be more or less than what is set out in the Ante-Nuptial Agreement depending on the facts presented to the Court.

3. The Court also finds that the provision in the Ante-Nuptial Agreement that limits Plaintiff's alimony in solido is likewise invalid. If that provision was simply an attempt by Defendant to buy Plaintiff out of her share in the house then that provision shall be enforceable.

4. In summary, the Ante-Nuptial Agreement entered into and executed by the parties on August 25, 2002, shall be, and hereby is, valid and enforceable except as to those provisions regarding alimony as set forth herein.

-11-

In the Trial Court's incorporated oral ruling, the Trial Court stated:

THE COURT: Well, this is certainly not an easy call to make. Let me say that with regard to almost every issue involved in the terms of this agreement, which is contained in Exhibit No. 1, that I find that the agreement was entered into by the wife knowingly, voluntarily, without duress or undue influence, that she did not have independent advice but that she had some legal advice from Mr. Trew who offered her the opportunity to seek, as I recall, counsel if she wanted it. And I also do not believe that Mr. Trew would have allowed her to sign this agreement, Exhibit No. 1, in the event that she was crying or demonstrating some other evidence of her reluctance to sign the agreement or her unwillingness to sign the agreement, except for some pressure or some force that was being applied to her by Mr. Grubb. I don't -- if she felt pressured, and I think I recall Ms. Grubb saying that she might have been trying to hide her tears, maybe I heard that wrong, maybe I remember that incorrectly, but I seem to remember something to that effect. But in any event, had she been crying, Mr. Trew would not, in my opinion, and it would be my finding, would not have allowed her to complete the execution of the agreement, Exhibit No. 1, and that she knew at the time that she signed the agreement, Exhibit No. 1, that her husband to be, Mr. Grubb, had assets totaling approximately five million dollars.

It was also testified to that his income the year that he signed that agreement was approaching five hundred thousand dollars, as I recall, and that he was in the process of establishing multiple new stores, Rent To Own, which he was doing with the help of what he referred to as his team, which I assume was a business venture not just for the store in Rockwood, but for all of these new stores as well, although I'm not sure about that. I mean it could have been just Mr. Grubb alone that was establishing these new stores. I never heard anything said about his brother being part of the team on the new stores that were being created.

So in respect to all of the provisions of this agreement that relate to the property and income of Mr. Grubb, as of the date of the execution of the agreement, I find that all of that was sufficiently disclosed and that the wife on that date, which was August 26th of 2002, entered into it knowing the contents of Exhibit A to the agreement, and also because they had been living together knew something of his annual income from the business. She knew that she was marrying a wealthy man.

I guess the problem that I'm having with Exhibit No. 1 is that it not only deals with the assets and earnings of Mr. Grubb as of the date of the

-12-

execution of the agreement, but contains provisions that would control all of the rights and responsibilities of the parties for all of the future of the marriage, including, as would be the case here, all future income and acquisition of wealth by the husband which I've been sitting up here looking, most of that is contained on pages four and five of the agreement under -- down at the bottom of page four, paragraph A, or subparagraph A, and then going over to page five, the second paragraph, where it says, in the event the parties have been married for greater than five years prior to the filing of a complaint for divorce, James Wesley Grubb shall pay to Rhonda Sue Griffis the sum of one hundred thousand dollars as alimony in solido for her use in purchasing a residence. This sum is not subject to modification for any reason. This sum shall be due within ninety days of the entry of a final decree of divorce, and until payment thereof, Rhonda Sue Griffis shall have the right to reside in the Kingston, Roane County, Tennessee residence. Upon payment of this sum she shall vacate the residence within sixty days. And then down at the bottom of page five, paragraph five, it says, in the event that the parties have been married greater than ten years, Rhonda Sue Griffis shall not be entitled to permanent alimony, but the Court may determine the amount of temporary rehabilitative alimony based upon the circumstances of the parties with the amount not to exceed two thousand dollars per month, and the duration not to exceed forty-eight months or four years. So that's two thousand dollars a month for four years. And it's to be determined upon the circumstances of the parties with a cap placed on it of two thousand dollars, which attempts to cap her right to alimony without regard to the accumulation of wealth or annual income of her husband, and that's where I think that the provisions of Exhibit No. 1 fall way short.

Indeed, as I recall, and I've been sort of thumbing back through it here, the initial draft agreement prepared by Mr. Trew appears in some respects to have been more liberal on some of these things. And I can only conclude that they were changed to the amounts and durations contained in Exhibit No. 1 at the direction of Mr. Trew's client, Mr. Grubb. And here's a man that was, back in 2002, making five hundred thousand dollars a year, whose personal efforts and his team's efforts, as I recall, were in the process of establishing twenty new Rent To Own businesses in Tennessee and adjoining states. And I don't think personally, and all of that, of course, her right to future alimony would be -- then we'd have to have a hearing on that to see if she's going to be entitled to less than two thousand dollars.

Basically, I think that that attempt to cap that amount based upon facts that were not known at the date of the execution of the agreement but

-13-

which could only be determined by the subsequent events and life circumstances of the parties, that that is unreasonable and should not be enforced. And that it seems to me that that is an open issue, in whereas I don't have any problems with the differences in the age or wealth or educational circumstances of the parties to try and cut off the wife after thirteen years of marriage and two children, for what is it, twenty-five hundred dollars a month for forty-eight months, and a hundred thousand dollars to go out and buy a house is patently unreasonable for somebody who has the ability to work and earn -- accumulate wealth and earn money in the way and manner that Mr. Grubb can.

There is a disparity between the husband and wife that is so great and that is being attempted to be -- he has attempted to shield himself from that in spite of her contribution to the home and the parties children. And I say this without making any assumptions at all about whether or not she was easy to get along with or compliant or helpful or things like that. It's just that I think that this is an open issue and that I should not allow that provision of the agreement to close the Court's ability to inquire into those matters and to set something that is fair based upon the facts and circumstances after the date of their marriage and after the date of the signing of the agreement, Exhibit No. 1.

And so I'm not going to be bound by that. I'm going to make that an open issue. I want to hear the case, the facts from and after the signing of the agreement for the purpose of determining what, if any, amounts of money she might be entitled to for less than forty-eight months or more than forty-eight months, and regardless of the attempt to cap that amount of money at twenty-five hundred dollars a month for a limited time.

***

So that's the way I see it, gentlemen, and I think Mr. Trew did as good a job as anybody could do. It looks like a thorough job by Mr. Trew. And I believe him when he says that he attempted to be fair and wanted to be fair with Ms. Grubb. So I don't really basically have any problems with the agreement except for the future, what happened after that, the accumulation of wealth. The ability for the husband to provide for a wife that's got no real ability to accumulate wealth or produce it the way the husband has.

***

MR. STAIR: What I'm understanding is that the Court's holding is the agreement is valid except as to the alimony.

THE COURT: Right, I am.

In May 2016, Husband filed a motion for summary judgment on certain issues, arguing that (1) that Wife's adultery precluded alimony, (2) that Wife was not entitled to alimony because she would not be rendered a public charge, and (3) that Wife was not entitled to any portion of Husband's increases in income from his alleged separate property. This motion was heard in July 2016. In its August 2016 order denying in part and granting in part summary judgment, the Trial Court stated: "Defendant's Motion for Summary Judgment shall be, and the same hereby is, denied, except that Defendant's Motion shall be, and hereby is, granted in so far as Plaintiff shall not be entitled to any alimony." In its incorporated oral ruling, the Trial Court stated:

THE COURT: Gentleman, it would be my opinion that earned income, and that would be of the sort reported annually on an income tax return and reported on a W-2 form from the husband's various businesses, would not be -- not -- would not come within the definition of separate property or the appreciation in value of separate property but is earned income, and as such could be used to acquire other property or to simply go into some sort of financial account somewhere, and so in that respect, I disagree with the husband and deny the husband's motion for summary judgment as he has argued here today, and to the extent that we have earned income that has accumulated, then that is something that is different from the appreciation in value of separate property that the parties had at the time of the divorce, or marriage rather, and is -- is something that has to be resolved as part of this proceeding. The alimony, I'd want to see, I guess, I'm sure an order was put down.

\*\*\*

MR. STAIR: In terms of our motion for summary judgment regarding the alimony, the adultery provision in the agreement.

THE COURT: Well, I think that's valid. I think that's valid. If -- if there's an admission, if that -- if that was stated as one of the undisputed material facts in the case and that was admitted, then I think that's a valid provision, and so it then comes down to just an issue of was there earned income and what is left of that, and -- and I started to say a minute ago, perhaps I didn't, that an equitable division of any assets such as that, such as what we're talking about, does not require an equal division, but only an equitable division, and so I'll hear proof on that.

-15-

MR. WILLIAMS: Your Honor, I just --

MR. STAIR: That's being the only issue, Your Honor, is the -- the --

THE COURT: It would seem that after -- after the provision of the antenuptial agreement with regard to the wife's alimony is enforced, then all that's left is what the husband's annual income has been from his work and any -- or not appreciation -- but accumulation in one form or another of those earnings would be subject to inquiry by the wife and division by the wife, division by the Court.

The remaining issues in the case also were tried in July 2016. The permanent parenting plan approved by the Trial Court designated Wife as the primary residential parent and awarded her 225 days to Husband's 140. Husband was to pay $2,742 monthly in child support. Husband was ordered to pay the children's private school tuition. The Trial Court awarded half the value of the business interests to Wife, as well as half the value of certain real properties. Husband retained control of the businesses. In sum, Husband was to pay Wife $1,580,492.50 as part of the division of the marital estate as classified by the Trial Court. The Trial Court's August 2016 final judgment, however, did not contain any detailed factual findings. In fact, strangely, a line that would have incorporated the Trial Court's oral findings was stricken out by pen and initialed by the Trial Court. Husband appealed to this Court.

## **Discussion**

Both parties raise a number of issues on appeal. However, for reasons we discuss later in this Opinion, the two dispositive issues are: 1) whether the Trial Court erred in determining that, apart from the provision capping alimony, the Agreement was valid and enforceable; and 2) whether the Trial Court's final judgment contained sufficient findings to enable appellate review on those remaining issues other than the validity of the Agreement.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court erred in determining that, apart from the provision capping alimony, the Agreement was valid and enforceable. Prenuptial contracts are favored by public policy in Tennessee. *Perkinson v. Perkinson*, 802 S.W.2d 600, 601 (Tenn. 1990); *Hoyt v. Hoyt*, 372 S.W.2d 300, 303 (Tenn. 1963); *Key v. Collins*,

236 S.W. 3, 4 (Tenn. 1921). Prenuptial contracts benefit the parties by defining their marital rights in property which tends to be among the most frequent causes of family discord. *Sanders v. Sanders*, 288 S.W.2d 473, 477 (Tenn. Ct. App. 1955). An engagement to marry establishes a confidential relationship between the parties. *Baker v. Baker*, 142 S.W.2d 737, 745 (Tenn. Ct. App. 1940). Accordingly, engaged persons who plan to execute a prenuptial agreement must make "a full disclosure of the nature, extent and value" of their property in order to enable their prospective spouse to make a knowledgeable decision about entering into the agreement. *Williams v. Williams*, 868 S.W.2d 616, 619 (Tenn. Ct. App. 1992). As pertinent to this appeal, Tenn. Code Ann. § 36-3-501 provides:

> **36-3-501. Enforcement of antenuptial agreements.** – Notwithstanding any other law to the contrary, except as provided in § 36-3-502, any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage that is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined, in the discretion of such court, to have been entered into by such spouses freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

Tenn. Code Ann. § 36-3-501 (2014).

Regarding the burden of proof and what constitutes sufficient disclosure in antenuptial agreement cases, our Supreme Court has instructed:

> As we interpret the knowledge element of the statute, the spouse seeking to enforce an antenuptial agreement must prove, by a preponderance of the evidence, either that a full and fair disclosure of the nature, extent, and value of his or her holdings was provided to the spouse seeking to avoid the agreement, or that disclosure was unnecessary because the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the proponent spouse's holdings.

> * * *

> The extent of what constitutes "full and fair" disclosure varies from case to case depending upon a number of factors, including the relative sophistication of the parties, the apparent fairness or unfairness of the substantive terms of the agreement, and any other circumstance unique to

the litigants and their specific situation. *Perspectives* at 25. While disclosure need not reveal precisely every asset owned by an individual spouse, at a minimum, full and fair disclosure requires that each contracting party be given a clear idea of the nature, extent, and value of the other party's property and resources. *Id.* Though not required, a fairly simple and effective method of proving disclosure is to attach a net worth schedule of assets, liabilities, and income to the agreement itself. *See, e.g.*, *Pajak v. Pajak*, 182 W.Va. 28, 385 S.E.2d 384, 388 (1989); *Hartz v. Hartz*, 248 Md. 47, 234 A.2d 865, 871, n. 3 (1967) ("The careful practitioner has often caused to be prepared an itemization of the property covered by the agreement with appraised values and caused it to be made part of the agreement.").

In the absence of full and fair disclosure, an antenuptial agreement will still be enforced if the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the other spouse's property and holdings. Of course, the particular facts and circumstances of each case govern, to a great degree, the determination of knowledge. Some factors relevant to the assessment include, but are not limited to, the parties' respective sophistication and experience in business affairs, the duration of the relationship prior to the execution of the agreement, the time of the signing of the agreement in relation to the time of the wedding, and the parties' representation by, or opportunity to consult with, independent counsel. *Perspectives* at 18; *see, e.g.*, *Norris v. Norris*, 419 A.2d 982, 985 (D.C. App. 1980); *Del Vecchio*, 143 So.2d at 21; *Simeone*, 581 A.2d at 167.

*Randolph v. Randolph*, 937 S.W.2d 815, 821-22 (Tenn. 1996).

This Court in addressing the issue of what disclosure satisfies Tenn. Code Ann. § 36-3-501 has stated:

In cases where antenuptial agreements have been enforced, we have made clear that the basic question which must be answered is whether the spouse was misled, where the proponent of the agreement makes a fair disclosure, even if it [is] not 100% exhaustive, and the spouse had the opportunity to ask questions and discover the extent of the other's holdings but failed to do so due to lack of interest, then the agreement has been held valid. *See, e.g., Cantrell v. Estate of Cantrell*, 19 S.W.3d 842 (Tenn. Ct. App. 1999); *Wilson v. Moore*, 929 S.W.2d 367 (Tenn. Ct. App. 1996);

-18-

*Kahn v. Kahn*, 756 S.W.2d 685 (Tenn. 1988). *Also see, Spurlock v. Brown*, 91 Tenn. 241, 18 S.W. 868 (1892).

*Reece v. Elliott*, 208 S.W.3d 419, 422 (Tenn. Ct. App. 2006). We also have explained:

> While some state courts have resolved the issue differently, most courts have not construed the full and fair disclosure requirement to mandate detailed disclosures such as financial statements, appraisals, balance sheets, or the like. Thus, in the absence of fraud or overreaching, the inadvertent failure to disclose an asset or the unintentional undervaluation of an asset will not invalidate a prenuptial agreement as long as the disclosure that was made provides an essentially accurate understanding of the party's financial holdings. The disclosure will be deemed adequate if it imparts an accurate understanding of the nature and extent of a person's property interests.

*Wilson v. Moore*, 929 S.W.2d 367, 371 (Tenn. Ct. App. 1996) (citations omitted) (footnotes omitted).

Our Supreme Court discussed when a provision limiting alimony may be upheld:

> We . . . conclude that antenuptial agreements containing a provision limiting or waiving alimony are not void as contrary to public policy. So long as the antenuptial agreement was entered into freely and knowledgeably, with adequate disclosure, and without undue influence or overreaching, the provision limiting or waiving alimony will be enforced, with one exception.
>
> We agree that the State's interest in providing adequate support for its citizens precludes specific enforcement of such a contract provision if enforcement deprives one spouse of support that he or she cannot otherwise obtain and results in that spouse becoming a public charge. The trial court must examine the terms of the antenuptial agreement at the time of the divorce to insure that its enforcement will not result in the spouse being deprived of alimony, becoming a public charge. If a spouse would be rendered a public charge by specific enforcement, the trial court must void the provision and award alimony in accordance with the factors set out in Tenn. Code Ann. § 36-5-101 . . .

*Cary v. Cary*, 937 S.W.2d 777, 782 (Tenn. 1996).

As the proponent of the Agreement, Husband had the burden to prove, by a preponderance of the evidence, that the Agreement was entered into by Wife freely, knowledgably, and in good faith. While antenuptial agreements are favored by public policy, Tennessee courts do not simply rubberstamp their validity. The circumstances surrounding the signing of the agreement must be transparent and attended by sufficient disclosure of property interests. Other important considerations are the timing of signing an antenuptial agreement in relation to the wedding date, the relative sophistication of the parties, and the opportunity of parties to secure independent counsel in order to review an antenuptial agreement. We previously have found an antenuptial agreement invalid where:

> Wife, wishing to go ahead with getting married, was rushed into signing an antenuptial agreement which lacks values for Husband's listed assets. In any event, Wife, lacking independent counsel, was misled by Husband to believe that the agreement would be invalid as an antenuptial agreement. The evidence in this case reflects a fundamentally unfair, hurried, and opaque process by which Wife was misled by Husband to enter into this antenuptial agreement.

> ***

> Wife, unsophisticated in legal or financial matters, and, with a limited awareness of Husband's financial status, including the value of his assets, underwent a haphazard, deceptive, and generally inadequate process leading up to the agreement.

*Stancil v. Stancil*, No. E2011-00099-COA-R3-CV, 2012 WL 112600, at *5-6 (Tenn. Ct. App. Jan. 13, 2012), *no appl. perm. appeal filed*.

As in *Stancil*, there is the element of Wife being rushed to sign the Agreement. Although Husband had mentioned to Wife that he desired an antenuptial agreement months before, Husband and Wife signed the Agreement when the parties met with attorney Trew only two days before departing on vacation to be married. Husband testified at trial that he encouraged Wife to seek independent counsel, and even offered to pay for it. Nevertheless, even crediting Husband's testimony as the Trial Court implicitly did, it is at best doubtful that Wife could have obtained independent counsel and made an informed decision before setting out so soon on vacation to be married as planned. While Wife could have attempted to delay the wedding date until she could get her own lawyer, we will not close our eyes and ignore the immense gap in the parties' education and sophistication and experience in business affairs. Wife's opportunity to secure independent counsel to review the Agreement was illusory in practice.

-20-

In addition to the lack of independent counsel for Wife, there is the issue of the dramatic disparity between the parties in terms of sophistication. Husband was a wealthy, college-educated, and successful businessman. Wife was 20 years old, less than half Husband's age, and a G.E.D. was the summit of her formal education. Wife was financially dependent upon Husband. The balance of worldly sophistication in this relationship was decidedly one-sided. That the signing of the Agreement took place in the perfunctory ticking off of Husband's pre-vacation checklist likewise does nothing to suggest Wife had a full and fair chance to comprehend exactly what she was signing away.

Husband, as the proponent of the Agreement, had the burden of proving that the Agreement was entered into by Wife freely, knowledgably, and in good faith. The evidence in this case preponderates against the Trial Court's findings of fact that Wife entered into the Agreement "freely, knowledgeably and in good faith and without exertion of duress or undue influence upon [Wife]." Tenn. Code Ann. § 36-3-501 (2014). This being so, Husband failed to satisfy his burden of proof.

It is not our intention herein to promulgate a bright-line rule. We make our decision given the specific facts based upon the evidence in the record on appeal. Most salient to us are the timing of the wedding in relation to Wife's being asked to sign the Agreement and the parties' dramatic disparity in sophistication. Not only is it not our intention to promulgate a bright line rule, it is impossible to do so. What must be considered is the interplay between all the relevant factors including the time factor and the sophistication of the spouse being asked to sign the antenuptial agreement. The time element cannot be viewed in isolation. While it is not a direct linear relationship, the more sophisticated the spouse is, the less time he or she may well need in order to be able to enter into the agreement freely, knowledgeable, and in good faith without duress or undue influence. Conversely, the less sophisticated the spouse is, the more time he or she may need.

The Trial Court found the Agreement invalid insofar as it purported to cap Wife's alimony. We decline to cherry-pick the Agreement to find enforceable provisions because we believe that the context in which Wife signed the Agreement was such that none of it is valid or enforceable. We reverse the Trial Court as to its determination that the Agreement was in any part valid or enforceable.

We next address whether the Trial Court's final judgment contained sufficient findings to enable appellate review on the remaining issues other than the validity of the Agreement. Regarding how this Court may proceed when confronted with limited findings of fact and conclusions of law, we have stated:

> We note ... that Rule 52.01 of the Tennessee Rules of Civil Procedure requires the trial court to state expressly its findings of fact and conclusions of law, even where the parties do not request it. Tenn. R. Civ. P. 52.01. If the trial court fails to do so, its decision is normally vacated and the cause remanded for such findings and conclusions; however, the appellate court may, in some circumstances, "soldier on" in the absence of them. *See Town of Middleton v. City of Bolivar*, No. W2011-01592-COA-R3-CV, 2012 WL 2865960, at *26 (Tenn. Ct. App. July 13, 2012).

*In re S.J.*, 387 S.W.3d 576, 594 n. 9 (Tenn. Ct. App. 2012).

The Trial Court's final judgment does not contain any detailed factual findings on these remaining issues. In fact, the Trial Court expressly marked out a line in its final judgment which would have incorporated its oral ruling. We do not quite know what to make of that. In some instances, we may "soldier on" and review the record to make the necessary determinations ourselves. In the present case, we find that soldiering on simply is not feasible. The parties raise a host of issues, including those issues pertaining to classification of separate and marital property, the division of the marital estate, child support, and school tuition. Attempting to resolve these fact-oriented issues without detailed factual findings by the Trial Court would be akin to conducting a fresh trial, which is not our role.

We, therefore, vacate the Trial Court's final judgment, and remand for the Trial Court to enter a new final judgment consistent with our decision holding the Agreement to be unenforceable and containing sufficient factual findings and conclusions of law as to each remaining issue, taking into account the applicable statutory factors where necessary. In the interim, Husband is to continue paying support for the parties' children as already ordered. The Trial Court, in rendering its new final judgment on remand, is not to consider the Agreement, which we have ruled to be invalid and unenforceable.

## Conclusion

The judgment of the Trial Court is reversed, in part, and vacated, in part, and this cause is remanded to the Trial Court for further proceedings as necessary and consistent with our Opinion and for entry of a new final judgment containing detailed findings of fact and conclusions of law on the remaining issues other than the validity of the Agreement. Costs on appeal are assessed equally one-half against the parties, the Appellant, James Wesley Grubb, and his surety if any, and the Appellee, Rhonda Sue Griffis Grubb.

-22-

_____
D. MICHAEL SWINEY, CHIEF JUDGE